In re Carrie L. FAIR, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 99–BG–1518.

District of Columbia Court of Appeals.

Argued Nov. 1, 2000.
Decided Sept. 13, 2001.

Karen J. Krueger, with whom Frederick A. Douglas, Washington, DC, was on the brief, for respondent.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for petitioner.

Before STEADMAN and SCHWELB, Associate Judges, and FERREN, Senior Judge.

STEADMAN, Associate Judge:

This bar disciplinary matter arises out of respondent's appointment as successor personal representative and attorney for the estate of Sara Fraction, who died intestate in 1981.[1] There is little question that respondent was dilatory and negligent

1. Respondent's acts of misconduct occurred in an extended time period beginning with her appointment as personal representative in 1987 until the closing of the estate a decade later. For her conduct prior to January 1, 1991, Bar Counsel charged her with the following violations: "(a) DR 1–102(A)(5), in that Respondent engaged in conduct that was prejudicial to the administration of justice; (b) DR 6–101(A)(3), in that Respondent neglected a legal matter entrusted to her; and (c) DR 7–101(A)(1), in that Respondent intentionally failed to seek the lawful objectives of her client through reasonably available means." For her conduct after January 1, 1991, when the present Rules of Professional Conduct came into effect, Bar Counsel charged her with the following violations: "(a) Rule 1.3(a), in that Respondent failed to represent her client zealously and diligently within the bounds of the law; (b) Rule 1.3(b), in that Respondent intentionally failed to seek the lawful objectives of her client through reasonably available means and/or to act with reasonable promptness in representing the client; (c) Rule 1.5(a), in that Respondent took an illegal fee and/or charged an unreasonable fee; (d) Rule 1.15(a), in that Respondent intentionally and/or recklessly appropriated Estate funds; and (e) Rule 8.4(d), in that Respondent engaged in conduct that seriously interferes with the administration of justice."

in carrying out her duties. The key issue before us involves her payments to herself of fees relating to the estate, a matter as to which the Board and the Hearing Committee were in sharp disagreement. Respondent first made such partial payments in 1994 totaling $6600 without prior court approval as was then required. Then, once court approval was obtained of a total for fees and expenses of $12,720, she overpaid herself in 1997 by almost $600. We conclude that, in the circumstances of this rather peculiar case, the record does not contain sufficient proof by "clear and convincing evidence" that these payments constituted the charged "intentional and/or reckless" misappropriation of estate funds so as to fall within the automatic disbarment rule of *In re Addams*. We suspend respondent from the practice of law for one year and sixty days.

## I.

The Board agreed with and adopted the Hearing Committee's findings of fact. The Board's summary of those factual findings is attached as Appendix A. These findings reflect a serious pattern of neglect by respondent of her duties with respect to the estate. Both the Hearing Committee and

the Board were in agreement that respondent had committed five charged disciplinary rule violations relating to that neglect, and we see no basis to conclude the contrary. As the Board report put it, "the evidence of inexcusable inaction on Respondent's part is overwhelming." [2]

The Hearing Committee and the Board sharply differed, however, on the charges of misappropriation and taking an illegal and/or unreasonable fee.[3] With respect to the $6600 fee payments without prior court authorization, the Hearing Committee concluded that no misappropriation had occurred at all. It noted that in prior cases before the Board, an attorney had received payment of legal fees from a personal representative prior to court authorization and the Board had rejected charges of misappropriation because the attorney was not entrusted with estate funds. *See In re Ray*, 675 A.2d 1381 (D.C.1996); *In re Travers*, 764 A.2d 242 (D.C.2000); *In re Mudd*, Bd. Dkt. 472–92 (1995). The Committee saw no reason why the result should be different where attorney and personal representative were the same person.[4] The Committee also noted that the section requiring prior court approval had been repealed by the legislature and

**2.** Respondent's defense in essence disputes the evidentiary record, but we are not persuaded to second-guess the Hearing Committee and the Board in that respect. The only significant question might be whether respondent's actions or inactions "seriously interfere[d] with the administration of justice" in violation of Rule 8.4(d). We agree that the misconduct here met the requirements set forth in *In re Hopkins*, 677 A.2d 55, 60–61 (D.C.1996), and "at least potentially impact[ed] upon the process to a serious and adverse degree." *Id.* at 61. Bar Counsel does not challenge the finding that respondent did not violate DR 1–102(A)(5).

**3.** Rule 1.5(a) requires that "a lawyer's fee shall be reasonable." Rule 1.5(f) provides that "[a]ny fee that is prohibited ... by law is

*per se* unreasonable." Although not enacted until 1996, we agree with Bar Counsel that this addition simply clarified the meaning of the existing rule. The predecessor DR 2–106(A) barred the collection of an illegal or clearly excessive fee and there is no reason to think that the 1991 revision was intended not to carry forward the concept of illegality.

**4.** The Committee reasoned: "Personal representatives, who often are appointed only because they are family members, have no basis on which to disregard advice and instructions of the attorneys they retain to get them through the probate process. As a practical matter, these attorneys have as much control over estate funds as do attorneys who are also filling the role of personal representatives."

that the legislature "cannot have intended to legalize misappropriation of client funds." Finally, the Committee concluded that even if there was misappropriation, the conduct constituted at most negligence, given the expert testimony as to the actual practice in probate proceedings at the time. The Committee rejected the charge of taking an illegal and/or unreasonable fee on the basis of the eventual award by the court of total fees and expenses almost twice that of the $6600. Finally, the Committee ascribed the $600 overpayment of the total approved fees to "negligent miscalculation and nothing more." The Committee recommended a suspension of sixty days.[5]

The Board disagreed with the Hearing Committee's disposition of the misappropriation and unreasonable fee charges. With respect to the $6600 fee payments in 1994 without prior court approval, the Board deemed itself bound by *In re Utley,* 698 A.2d 446 (D.C.1997), in which a conservator paid herself a fee without court authorization and was deemed to have misappropriated the funds.[6] The Board further concluded that since, as in *Utley,* respondent knew that prior authorization was required by statute, her unauthorized payments could not be characterized as negligence. The Board distinguished this situation from those in which attorneys who were not also personal representatives received fees without prior court approval, since an attorney acting in a dual role is "entrusted" with estate funds. In its discussion, the Board did not address the repeal of the violated statute. With respect to the $600 overpayment in 1997, the

Board concluded that since, in its view, respondent did not keep records and simply tried to keep the numbers in her head, her overpayment could only be characterized as "reckless." Finding no extenuating circumstances to take this proceeding outside of the normal rule of *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc), the Board recommended disbarment.

## II.

■ Very recently, in *In re Anderson,* 778 A.2d 330 (2001), and a few months previously in *In re Berryman,* 764 A.2d 760 (D.C.2000) we reviewed at length the general concept of misappropriation and the holding of *In re Addams,* with extensive case analysis. We need not repeat those efforts here. In sum, misappropriation is "any unauthorized use of client's funds entrusted to [an attorney], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Harrison,* 461 A.2d 1034 (D.C.1983). "[I]n virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams,* 579 A.2d at 191. It is thus "the long-standing rule in this jurisdiction that intentional or reckless misappropriation of client funds will result in disbarment, save perhaps for extraordinary circumstances." *In re Viehe,* 762 A.2d 542, 543 (D.C.2000) (per curiam). Such intentional or reckless misappropriation means a showing that the attorney

---

**5.** Both Bar Counsel and respondent filed exceptions to the Hearing Committee report: Bar Counsel to the conclusions that there was no misappropriation of fees and no unreasonable fee, and respondent to the conclusions on neglect and interference with the administration of justice.

**6.** The Board also relied on *Ray* in concluding that respondent had, by that unauthorized payment, received an illegal fee in violation of Rule 1.5(a).

handled entrusted funds "in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds." *Anderson,* at 339.[7] Bar Counsel must prove disciplinary violations by "clear and convincing evidence." This standard is applicable to proof of underlying facts to support the "intentional or reckless" component of *Addams,* which can have such a drastic effect on the penalty to be imposed in contrast to "negligent" misappropriation. *In re Anderson, supra,* at 334–337. The burden thus is upon Bar Counsel to show such a level of culpability by clear and convincing evidence to bring it within the rule of *Addams.*

In the case before us, disagreeing with the Hearing Committee, the Board took the view that respondent had engaged in misappropriation both by taking a fee out of estate assets without the then-requisite prior court approval and, subsequently, once the amount of the fee had been approved by the court, taking from estate assets an amount roughly $600 in excess of that approved fee. The Board further concluded that in both instances, the misappropriation fell within the rule of *Addams* and recommended disbarment. We examine each instance in turn.

**A.**

As summarized in the Board's findings of fact, "between June and September 1994, respondent wrote six checks to herself as fee payments on the estate's bank account, for a total of $6600.[8] At the time of these payments, the statute and Probate Court rules[9] required prior court approval for payments of fees for services. Respondent was aware of this requirement." *Id.*

██ We agree with the Board's conclusion that this conduct constituted misappropriation as we have defined that term. It correctly viewed as controlling in that regard *In re Utley.* In that case a conservator had taken fees and commissions without prior court approval, as required by law, and we held that this conduct constituted misappropriation. Likewise, in *In re Evans,* 578 A.2d 1141 (D.C.1990), we held that an attorney also acting as personal representative had misappropriated estate funds when he paid himself a fee in excess of that approved by the court in the mistaken belief that the heirs had consented to that action.[10]

The critical question, however, is whether the unauthorized payment which constituted the type of "intentional and/or reckless" misappropriation which would bring the action within *Addams,* as the Board thought. This is a conclusion of law requiring de novo review, and we have the

---

7. That case also rejected any notion that some level of conduct short of recklessness, such as "gross negligence," might meet the *Addams* requirements. *Anderson,* at 338 n.4.

8. The request for compensation that was filed in connection with the tenth accounting, see note 22 *infra,* identified these payments as $5000 for "partial payment of the litigation fees" and $1600 for "some of the litigation expenses."

9. D.C.Code § 20–751 (1989 Repl.), as implemented by Super. Ct. Prob. R. 124. Respondent argues that the requirement was essen-

tially a procedural provision, replacing the former percentage fee compensation with a "procedural framework" to aid the court in determining the "reasonableness" of the fee, citing and quoting *Poe v. Noble,* 525 A.2d 190, 193 (D.C.1987).

10. As already indicated, the Board's consistent position has been that no misappropriation is involved when an attorney who is not also the personal representative accepts payment of a fee without court authorization. We have had no occasion to rule on that precise issue ourselves and do not do so now.

obligation to make our own determination on the issue. *In re Anderson, supra,* at 339 n.5 (citing *In re Micheel,* 610 A.2d 231, 234 (D.C.1992)) (question is one of " 'ultimate fact'—[*i.e.,*] a conclusion of law"); *In re Berryman,* 764 A.2d 760, 766 (D.C. 2000).

We think the Board put excessive weight on *Utley* in coming to this conclusion. As indicated, *Utley* also involved payment of a fee without required prior court approval. But *Utley* involved far more. First of all, respondent there for twenty-one months refused to repay the improper fee despite having had the irregularity called to her attention and despite numerous court requests for repayment. We concluded that "respondent's flagrant disregard of the court's inquiries for almost two years is an aggravating factor of sufficient magnitude to compel us to conclude that she was reckless." Furthermore, even after being told of the impropriety, respondent there took yet a third payment without court approval. "Especially in light of this third act of payment despite court requests to return the earlier two unapproved payments, we cannot characterize these deliberate acts as the product of simple negligence." 698 A.2d at 450. No such recalcitrance or open

defiance was exhibited by respondent here.[11]

This case now before us presents two rather perplexing aspects which distinguish it from fitting neatly into our precedents. First of all, as the Hearing Committee emphasized, within less than a year after respondent had paid herself a portion of her fee without the then-requisite prior court authorization, the legislature as part of a general revision of probate practice eliminated the need for any such court approval. *See In re Travers,* 764 A.2d 242, 245 n. 1 (D.C.2000). In the Committee's words, "the repeal has to be read to reflect a legislative judgment that estates can be properly administered without requiring prior court approval of fee withdrawals by fiduciaries, and that there is nothing morally or ethically offensive about such a practice." The repeal was not made retroactive, to be sure,[12] but nonetheless to disbar an attorney on grounds of intentional misappropriation or its equivalent for committing a type of act which within a year was legislatively determined to be utterly licit is a somewhat unsettling concept.

Second, unlike in *Utley* or any similar misappropriation case, the Hearing Committee heard extensive testimony by attor-

11. In *In re Berryman, supra,* the attorney, who was also the personal representative of a decedent's estate, was owed a legal fee by the decedent at the time of her death. Following the death, the attorney deposited checks and money orders belonging to the estate directly into what became her own account and later disbursed the funds for her own purposes. In doing so, she backdated a deposit slip to a time prior to the decedent's death and otherwise prevaricated with respect to the transaction, by which she placed herself ahead of all other creditors. Finding both intentional misappropriation and dishonesty, we disbarred the attorney under the *Addams* rule. In contrast, in another opinion decided the same day, *In re Travers,* 764 A.2d 242 (D.C. 2000), a probate attorney took a fee payment

with the consent of the heirs but without probate court approval. We agreed with the hearing committee's finding of negligent misappropriation because he initially believed that such approval was not required and in no way tried to mislead or conceal his conduct, although he did refuse to return the fee once the error was discovered. We imposed a ninety-day suspension. We see no point in rehearsing here the extensive examination of misappropriation sanction precedents contained in those two recent opinions.

12. The new law applied only to estates of decedents who died after its effective date of July 1, 1995. Historical and Statutory Notes to D.C.Code § 20–701.01 (2001).

ney Nicholas D. Ward, acknowledged by Bar Counsel as a probate expert, concerning the prevalence in actual probate practice at the time of payment of fees in probate matters without prior court approval. A flavor of that testimony is in this response by the expert to Bar Counsel's questioning:

> I think that you're making a distinction with failure to understand the nature of the practice. The rule says you don't do it [i.e., pay fees without prior court approval], but I'm testifying as an expert that the practice is that for most of the people who don't do it, it is not thought to be the end of the world. Their fees get approved, anyway. So what is the significance that we may draw from their not doing it? That, yes, it is not what you're supposed to do, but it just isn't that big a deal, to the bar, to the court, and to the judges.

The Hearing Committee's report, summarizing the situation, observed that "the practice in the Probate Court in mid 1994 does not appear to have emphasized strict adherence to the procedural provisions of § 20-751." The report then fairly quoted other portions of the expert's testimony: "[I]t is also clear that in a lot of cases, people pay themselves. They file their requests for compensation later and their requests are honored and nobody complained one iota about prepayments. . . .

The rule says you do it [request approval]. . . . But the practice is that when it's not done, most of the time nothing happens." The Register of Wills herself confirmed that such prepayments did occur in a small but significant number of cases, although very rarely where the attorney and the personal representative were the same person.[13] She further testified that invariably such unauthorized fee payments, including when the attorney was a different individual, drew at least an admonition.

In the case before us, the attorney took the estate funds not for her own use in the sense of stealing or for a temporary "loan" but rather as satisfaction for accruing fees, a legitimate but premature claim, so to speak, against funds which would ultimately be expected to be utilized for that purpose.[14] That factor alone, to be sure, will not necessarily suffice to negate a violation of the *Addams* magnitude if the taking is unauthorized, especially where aggravating factors are present as in *Utley*.[15] On the other hand, where the attorney has taken estate funds in satisfaction of fees owed, ignorant of the lack of authorization, we have recognized the negligent nature of the misappropriation; that is, the attorney should have known, but did not in fact know, of the need for authorization. *See, e.g., In re Travers*, 764 A.2d 242 (D.C. 2000) (attorney sincerely believed prior authorization did not apply to his situation);

---

13. She put the number of instances at something less than ten percent of the normal cases where the attorney was not also the personal representative. Where the two were the same person (a much less common situation in itself), she estimated there were annually only one or two cases of such prepayments.

14. Contrast, *e.g.,* this feature with *Addams*, where the escrowed funds were designated for use specifically to pay the client's promissory note. Addams knew he had no right to apply those funds to his fee, and he deliberately tried to hide the unauthorized withdrawals from the client. Likewise, in *In re Thomas*, 740 A.2d 538 (D.C.1999), the portion of the escrowed money that was to be paid to the insurance company was appropriated by the attorney to the payment of his fee, the client was dishonestly misadvised with respect thereto, and the attorney otherwise tried to cover up the misconduct, including fraudulently fabricated documents.

15. Another such instance was involved in *In re Berryman*. See note 11, *supra*.

*In re Ray,* 675 A.2d 1381 (D.C.1996) (attorney simply did not know he could not take fees without an accounting). Respondent is not in that same position, in that she was aware of the then-existing statutory requirement that prior court approval be obtained. But as far as the record developed before the Hearing Committee indicates, she acted in the context of an ambiguous probate culture and engaged in conduct which within the very next year was legislatively sanctioned as the probate norm for future estates by amendment of the statute.[16]

In sum, given the record in this proceeding, we think it goes too far to say that Bar Counsel has proven the type of intentional or reckless misconduct with respect to the unauthorized 1994 payments that clearly brings respondent within the *Addams* disbarment rule.

#### B.

■ We then turn to the second instance of misappropriation, the overpayment to herself by some $600 [17] of the

court-approved fees through a series of checks between May 23 and June 13, 1997. The Hearing Committee made almost nothing of that mistake, stating simply in a footnote that it was "an act of negligent miscalculation, and nothing more." [18] The Board, on the other hand, viewed the situation as one where respondent "did not keep records and tried to keep the numbers in her head" and that respondent as an experienced probate attorney must be taken to have full knowledge of the importance of keeping accurate records of funds entrusted to her. Citing *In re Micheel,* 610 A.2d 231 (D.C.1992), the Board concluded that the act of overpayment must be viewed as "reckless".

The difficulty we have with reconciling these two views is the thinness of the record with respect to precisely how respondent in fact handled the record-keeping of her duties as personal representative and attorney for the estate and what precisely was the relationship between record-keeping or lack thereof and the over-

**16.** We do not for a moment suggest that any such culture or subsequent change in the law can exonerate respondent from misappropriation discipline. For an attorney to knowingly disregard a statutory requirement is a serious matter not to be condoned. The trial court in substantially reducing respondent's total fees and expenses certainly took a dim view of respondent's conduct, saying, among other things:

> The record shows that Ms. Fair clearly understands the process for obtaining prior judicial approval for using funds of an estate for legitimate purposes. Thus, she cannot say that she did not know how to ask for judicial approval of a partial payment of her compensation.... This Court's analysis of the particular facts at hand discloses no excuse for the improper self-payment. The Court will not ratify this payment and will deduct this entire amount ($6,600.00) from any compensation that would be approved herein otherwise.... More importantly, this Court will refer this matter to Bar Counsel. This Court perceives no reason

why Ms. Fair, as an experienced probate lawyer, should have evaded the proper legal procedure for obtaining compensation. This should be investigated for possible disciplinary action.

(*In re Estate of Fraction,* Admin # 468–81 at 12–13 (D.C.Super.Ct.Prob.Div. May 12, 1997)).

**17.** The exact overpayment amount was $593.45. Respondent explained that she had left a little over six dollars in the account to cover postage costs and also explained the use of counterchecks as an attempt to save the cost of reordering account checks.

**18.** The footnote also stated that the overpayment amount was returned "two days later," which is strictly correct only in the sense that it was returned two days after Bar Counsel several months later called respondent's attention to the overpayment, not two days after the overpayment itself.

payment. Bar Counsel's examination of respondent on the issue was not extensive. Respondent's basic explanation for the error was that she assumed that the 1994 payments had totaled $6100 rather than $6600.[19] As she put it, the former figure was "in my mind" and she thought she had the total "in my head." In response to the direct question whether, apart from the figures in her head, respondent "didn't have any written record of payment to yourself or the total of the payments to yourself," respondent rather ambiguously answered "Yes. I had sort of added them up from time to time. I just didn't write checks willy-nilly without having some idea of how many checks that I had written." She then repeated that here the problem was that she thought she had taken out $6100 instead of $6600.[20] The Hearing Committee could say only that "respondent *appears* to have kept no record" of the checks written which resulted in the overpayment.[21]

In *In re Micheel, supra,* cited by the Board, the attorney commingled his own funds with client funds. He then "made no attempt to keep track of his client's

funds, but indiscriminately wrote checks" on an overdrawn account. 610 A.2d at 236. At least fifteen checks bounced as a result, including at least two involving client funds. On the "undisputed facts," we found recklessness. *Id.* at 234.[22]

In contrast, for example, in *In re Chang,* 694 A.2d 877 (D.C.1997), the attorney kept an account into which he placed both earned fees and client funds. He admitted he kept no written record of his earned fees. He wrote a check for an escrowed tax payment that led to a deficit in the account because the attorney mistakenly believed he had enough earned fees in the account to cover the check. We approved the Board's report finding no more than simple negligence, which reviewed at length a number of earlier cases coming to the same conclusion.[23]

In our recent *Anderson* case, we encapsulated the nature of the "reckless" inquiry as follows:

> These and other decisions, *see Berry-man,* 764 A.2d at 768–70 (summarizing cases), demonstrate that the central issue in determining whether a misappropriation is reckless is *how* the attorney

19. To be sure, even so, the overpayment would be $93.45, but this feature was never explored.

20. Respondent at least at one time had written records of those advance payments, and there was no showing she did not retain them. These payments were a subject of the fee approval proceedings following the submission of the tenth and final accounting. Her negligence was in failing to check her memory of their actual total against the records.

21. The Board summary of the Hearing Committee's findings in this one regard may push the record a bit, as we read it, in asserting that "respondent stated that the overpayment was a mistake made because she kept no record of the payments."

22. Another case involving a finding of reckless misappropriation was *In re Pels,* 653 A.2d

388 (D.C.1995). There, the complicated record demonstrated the attorney's "complete inability to account for the flow of funds that were received on [the client's] behalf," as well as several dishonored checks and other factors. 653 A.2d at 392. *In re Pierson,* 690 A.2d 941 (D.C.1997), on which the Board also relied, was held to involve intentional misappropriation where the attorney had repeatedly invaded the client escrow account to pay her general business expenses.

23. In *Micheel,* we likewise distinguished the recklessness evident there from those in which the attorneys "at least tried to keep track of their clients' funds but were unable to do so accurately." 610 A.2d at 236. The record here simply doesn't demonstrate that respondent didn't try at all to keep track of the overall fee payments.

handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds. (Emphasis in original) (some citations omitted).

*Anderson, supra,* at 339.

In our judgment, the record here as it stands is insufficient to show by the requisite clear and convincing evidence that respondent's actions rose to the level of *Micheel* in demonstrating a "conscious indifference to the consequences." *Anderson, supra,* at 339. We must conclude the instant case, insofar as the present record will bear, comes closer to those in which attorneys invaded client funds through mistakes rather than through reckless disregard.

### III.

■■ We turn finally to the question of sanction. At times, when the Board has misjudged the law in arriving at a recommended sanction, we have remanded the matter for a new recommendation. *See, e.g., In re Temple,* 629 A.2d 1203 (D.C. 1993). Ultimately, however, the decision as to sanction is "the responsibility and duty of this court." *In re Goffe,* 641 A.2d 458, 464 (D.C.1994) (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc)). The case before us has been in the disciplinary system for some time, it has been extensively briefed and argued before us by both parties, and we think that an acceptable sanction can be imposed on this record without the necessity of a remand.[24]

■ As *Chang* documents with citations, a six-month suspension is a norm for negligent misappropriation of entrusted funds. While respondent's conduct here was not proven to reach the culpability required to invoke the disbarment sanction of *Addams,* it did involve serious lapses in recognition of the exacting standards that must be expected of attorneys in dealing with the funds of others. Even negligent mishandling tends to "jeopardize . . . client funds held in trust and undermines public confidence in the bar." *In re Pels,* 653 A.2d 388, 389 (D.C.1995).

■ First, respondent withdrew funds in payment of her fees in connection with the probated estate knowing that prior court approval was required by statute. While she had worked on matters involving this estate for seven years at the time and her eventual approved fee was amply above the withdrawn amount, self-help at that time did not comply with probate requirements. Second, despite having been admonished by the probate court, she failed to meticulously ensure that the total amount of the fee actually taken from estate assets was no more than the approved amount. Third, her administration of the estate reflected a serious pattern of neglect in other respects.

Each of the two distinct acts of misappropriation should be treated separately and a one-year suspension imposed on the misappropriation counts. With respect to the neglect and related counts, the Hearing Committee (which found no misappropriation) recommended a sanction of sixty days. Although a more severe penalty would by no means be outside a permissi-

---

24. "The imposition of sanctions in bar discipline, as with criminal punishment, is not an exact science but may depend on the facts and circumstances of each particular proceeding. *In re Haupt,* 422 A.2d 768, 771 (D.C.1980) ('Within the limits of the mandate to achieve consistency, each case must be decided on its particular facts')." *In re Goffe, supra,* 641 A.2d at 463.

ble range here, we think that a fourteen-month suspension will achieve the purposes to be served by a disciplinary sanction. *See In re Reback and Parsons*, 513 A.2d 226, 231 (D.C.1986) (en banc). We also impose a requirement of fitness prior to reinstatement.[25]

Accordingly, it is ORDERED that Carrie L. Fair be, and she hereby is, suspended from the practice of law in the District of Columbia for a period of one year and sixty days, with reinstatement conditioned upon compliance with D.C. Bar R. XI, § 16(d). Respondent's attention is drawn to the requirements of D.C. Bar R. XI, § 14.

## APPENDIX A

\* \* \*

### BACKGROUND

We agree with and adopt the Hearing Committee's findings of fact, which we summarize below.

#### Hearing Committee Findings

Respondent has been a member of the Bar of the District of Columbia since 1963 and has practiced in the area of probate, trusts and estates since 1978.

The decedent was Ms. Sara Fraction, who had died intestate in 1981. She had one heir, Ms. Audrée Newsome, who had not been heard from since 1946. If she could be established as dead, 13 cousins would be heirs. The estate consisted of a small amount of cash in a checking account and a modest house and lot where decedent had resided. The estate was still open at the time of hearing before Hearing

Committee in January 1998. No distributions had been made to heirs.

Respondent was the third personal representative; the first, James R. Paige, was relieved of his duties at his request in March 1986. The second, Harold Zaret, Esquire, who had served as attorney for Mr. Paige, was appointed in April 1986 and served until his death in February 1987. Respondent was appointed in June 1987.

1. *Declaration of Death.* By the time of Respondent's appointment, an action had been filed for declaration of the death of Audrée Newsome, and a motion for default judgment had been filed. Respondent did nothing to seek resolution of this issue for over two years. In June 1989, her associate was told by the Probate Office that the motion for default judgment needed to be refiled. Six months later, in December, Respondent filed a motion to be substituted as plaintiff; the default motion was not refiled until April 1990. In July 1990, the Probate Court denied the motion without prejudice for failure to present evidence sufficient to raise a presumption of death.

Six months later, in January 1991, Respondent filed a petition to spend estate funds to hire a tracing service. In April 1992, she petitioned for permission to spend estate funds to purchase a written report of the result. This petition was granted in May 1992, and in September 1992 a third motion for default judgment was filed which was granted in November 1992, over five years after Respondent had been appointed.

2. *Sale of Property.* The other aspect of the administration of this estate involved sale of decedent's house. The first personal representative had filed an inven-

---

**25.** We impose this requirement principally to allow respondent to demonstrate the adequacy of her procedures that will be followed to prevent a repetition of mishandling of client funds.

tory in November 1981 including an affidavit of a professional appraiser valuing the real estate at $90,000. In July 1984, this personal representative petitioned the Probate Court for permission to sell the real estate for $52,000. This petition was granted on the condition that the personal representative file a general bond in the amount equal to the fair market value of the property as appraised by an appraiser approved by the court. As appraisal was then obtained showing the fair market value to be $52,000. In October 1984, the property was sold for $52,000 in compliance with the court's order and the proceeds were deposited in the estate's bank account.

In February 1987, the Probate Office wrote to Respondent's predecessor advising that it was necessary either to show what efforts had been made to sell the property at the 1981 appraisal price or to supply signed consents of all interested persons. Respondent learned of the need for consents shortly after her appointment in 1987 and the Probate Office instructed Respondent on several occasions thereafter to obtain these consents. In December 1988, she began seeking the consents. Respondent's expert testified that it was not necessary to obtain such consents in view of the fact that the sale had complied with the court's order. He said that the Probate Office's requirement of consents created a "phony issue."

Between late 1988 and early 1990, Respondent received 11 executed consents. Consents of the two remaining heirs were not available because they had died. Respondent did nothing further after 1992. Respondent did not file any petition for ratification of the sale. In 1998, when the Probate Court was finally asked to approve all accounts, it stated that the rules no longer required the filing of such con-

sents and proceeded to approve the accounts.

3. *Delays in Filing of Accounts and Inheritance Tax Return.* Respondent was dilatory in filing accounts, which are required to be filed with the Probate Office every nine months. Of the 10 accounts required, nine were filed late. The Probate Office issued 13 notices with regard to Respondents' failure to file accounts and to supply information required to complete the accounts.

The Probate Office also scheduled several summary hearings as a result of Respondent's delinquency in filing accounts and supplying information. A summary hearing was scheduled for November 17, 1992 to consider Respondent's removal or other action for her failure to file the Sixth Account. The hearing order was vacated on Respondent's filing of the Sixth and Seventh Account. A "Memorandum Under Probate Rule 121 with Respect to Delinquent Fiduciary" was filed on May 17, 1995, providing for a summary hearing on July 6, 1995. This hearing was continued to August 10, 1995 and the Eighth and Ninth Accounts were filed on August 9, 1995. The hearing was continued to September 15, 1995. Respondent filed the "Tenth and Final" account on September 15, 1995, and the summary hearing was vacated on September 21, 1995. A third summary hearing was noticed for November 12, 1996, for failure to complete requirements necessary for presentation of the eighth, ninth, tenth and final accounts. This hearing was continued until November 19, 1996 on Respondent's statement that she needed an extra day to file the requirements. Respondent made a submission to the Probate Office on November 19, 1996. The hearing was again continued, to November 26, 1996, but apparently not held.

 

There was no substantive activity in this estate from November 1992 to mid 1995. Despite the requirement for accounts to be filed every nine months, none was filed from March 1993 to August 1995. During this period, Respondent received numerous letters from the cousins or their representatives seeking resolution of the estate. Respondent did not answer any of these letters, or respond to phone calls, and the record shows that Respondent and her law clerk charged only 1.88 hours to this matter from December 1992 to August 1995.

4. *Unauthorized Self Payments.* Between June and September 1994, Respondent wrote six checks to herself on the estate's bank account, for a total of $6,600. At the time of these payments, the statute and Probate Court rules required prior court approval for payments of fees for services. Respondent was aware of this requirement. In her accounting of these payments, Respondent represented that the first check for $1,000 was for out-of-pocket expenses as well as fees and commissions, but these expenses were not itemized. In her request for compensation filed in November 1996, which followed an inquiry from the Probate Office on July 26, 1996, Respondent stated that $5,000 of the amount had been for "partial payment of litigation fees" and $1,600 for "some of the litigation expenses."

In her November 1996 request for compensation, Respondent sought $25,128.30 for services as personal representative and attorney and $2,152.58 for out-of-pocket expenses, and she also requested ratification of the payments previously made.

Certain of the heirs filed exceptions, taking the position (a) that the amount of compensation was unreasonable in proportion to the size of the estate and the complexities of the issues; (b) that $6,600 had been taken from the estate without court authorization; (c) that Respondent had unduly delayed the handling of the estate; and (d) that Respondent had not complied with the court's time requirements and had billed for work that was unnecessarily repetitious.

The Probate Court substantially agreed with the exceptions, concluding in part as follows:

> The Court has reviewed the entire chain of events in the heir search and related litigation. The Court concludes that this aspect of estate administration did not proceed in an expeditious way and that this estate languished in an open status for an unreasonable period of time.

The court reduced compensation as a result of this delay, awarding a total of $12,126.55 for attorney's fees, accounting services and law clerk compensation. Of this amount, $9,383.25 was approved as Respondent's fee.

The court also concluded that the self-payment had been improper. The court noted that Respondent was aware of the process for obtaining prior judicial approval and that she had presented no justification for having not done so. The court found she had acted in an arbitrary and self-serving manner; refused to ratify the self-payment; denied reimbursement of out-of-pocket expenses; and referred the matter to Bar Counsel. The court stated:

> This Court perceives no reason why Ms. Fair, as an experienced probate lawyer, should have evaded the proper legal procedure for obtaining compensation. This should be investigated for possible disciplinary action.

5. *Excess Payments of Fees.* Respondent proceeded to write another series of checks for payment of the court-approved fees. The total amount of these checks was $593.75 more than the court approved. Respondent stated that the overpayment

was a mistake made because she kept no record of the payments. She testified that she tried to keep the figures "in [her] heard." The overpayment was returned after it was brought to Respondent's attention by Bar Counsel.