**In re Willie N. HEWETT, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 372772).**

**No. 07–BG–624.**

District of Columbia Court of Appeals.

Argued Feb. 6, 2009.

Decided Jan. 13, 2011.

Ronald Steven Douglas, for respondent.

Ross T. Dicker, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, for the Board on Professional Responsibility.

Before RUIZ, KRAMER and BLACKBURNE–RIGSBY, Associate Judges.

RUIZ, Associate Judge:

In this case, we determine, for the first time, that the presumptive rule of disbarment established in *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc), should not be imposed as a sanction for intentional misappropriation. We adopt the Board on Professional Responsibility's uncontested finding that respondent misappropriated client funds but, unlike the Board, conclude that the misappropriation was intentional, not negligent. However, we agree with the Board's alternative recommendation, and conclude that the facts of this case present "extraordinary circumstances" that warrant an exception to *Addams*'s presumptive discipline of disbarment for intentional misappropriation, *id.*, and adopt the Board's recommended sanction that respondent be suspended for six months, with the suspension stayed in favor of probation.

## I. Facts

The Hearing Committee found the following facts, which the Board adopted. Respondent, Willie N. Hewett, has practiced law in the District of Columbia for over 15 years without any prior ethical complaint against him. On March 6, 1992, respondent was appointed by the Probate Court to serve as successor conservator for Ralph H. Jewell, who had been a ward of the court since 1985. The Hearing Committee and the Board found that, as

Jewell's conservator, respondent "completely fulfilled his duties ... and took steps, based on basic human kindness, which went beyond his legal responsibility to his ward." Mr. Jewell, who lived in a nursing home, was confined both to a wheelchair and a feeding tube. Other than respondent and a church group, he had no relatives or visitors; respondent "visited Mr. Jewell on personal, uncompensated visits." Mr. Jewell died on April 21, 2003, and respondent was the only person at his funeral.

The facts giving rise to the instant disciplinary matter occurred when respondent was given notice in March of 2001 that Mr. Jewell would be undergoing a Medicaid eligibility review in the next few months and that his cash assets "could not exceed $2500 or he would be disqualified for Medicaid." (internal alterations omitted). Mr. Jewell's nursing home care was paid for by Medicaid; his only source of income was $90 per month from the Veterans Administration. After he was appointed as conservator, respondent had established a bank account in Mr. Jewell's name, in which the monthly Veterans Administration checks were deposited and for which respondent filed an annual accounting. In March of 2001, there was a total of $7,820.79 in Mr. Jewell's account, $5,320.79 over the maximum allowed to maintain Medicaid eligibility. "Respondent believed and the Hearing Committee found that a disqualification would have been devastating to the interests of the ward."

In preparation for the Medicaid eligibility review, respondent began to spend down Mr. Jewell's bank account. Among other items, respondent purchased a blue serge suit and gloves, which had been requested by Mr. Jewell, and paid a funeral home for "pre-need funeral expenses," and for "Grave opening and closing; Marker and Vault Placement," at a cemetery. In total, respondent spent $4,646.54 on behalf of Mr. Jewell, but after deducting back charges and adding the month's $90 veteran's check, on May 30, the account was still approximately $750 over the Medicaid limit. The report to Medicaid concerning Mr. Jewell's assets was due May 31.

On May 31, 2001, respondent filed with the probate court the ninth annual accounting of Mr. Jewell's finances, together with a separate petition seeking a fee of $2,006.25 for his "legal services." The Board found that "but for the impending Medicaid review, Respondent would not have filed the petition for legal fees." Respondent's petition detailed the time he had spent on Mr. Jewell's matters during the year, and "carefully documented" 16.05 hours, which included "filing appropriate documents on the ward's behalf when necessary, and visiting the ward to assess his needs and provide for those needs." The petition requested a "reasonable fee" of $125 an hour. Contrary to the applicable statute and court rule, respondent withdrew the requested funds from Mr. Jewell's account the same day he filed the petition, before any approval had been granted by the probate court. Although the petition stated that "[t]he ward is currently in the process of spending down to maintain Medicaid eligibility," it did not inform the court that the fees requested in the petition were being withdrawn as part of the spend-down. After the withdrawal, Mr. Jewell's account carried a balance of $1,244.09, within the Medicaid limit.

Respondent's ninth annual accounting was approved, but his fee petition was denied by the probate court on September 11, 2001, because the services respondent had provided to Mr. Jewell were "not legal in nature nor compensable as attorney's fees pursuant to court rule." (internal alterations omitted) Even though respondent had been appointed in 1992, because

Mr. Jewell's conservatorship had begun in 1985, it was governed by Superior Court Probate Rule 225, which provides that "[c]ompensation to a conservator ... for ordinary services shall be by commission which shall not exceed 5% of amounts disbursed from the estate."[1] In other words, while respondent was entitled to collect a fee for the services he provided Mr. Jewell, he was eligible to receive only 5% of the amounts disbursed from the estate, or approximately $23.67, for the 16 hours of "ordinary services" he had devoted to Mr. Jewell (less than $1.50/hr.). This was far less than the $2,000 he had requested as a "reasonable fee" for "legal services." The Hearing Committee credited respondent's testimony that he never received a copy of the order denying his fee petition.

Subsequently, the Probate Court scheduled a show-cause hearing for December 10, 2002, because respondent had not filed the next (tenth) annual accounting, due April 12, 2002.[2] The Hearing Committee found that it was not until December 8, 2002, in preparation for the hearing and for filing the tenth accounting, that respondent became aware that his fee petition filed the previous year had been denied. On December 9, 2002, respondent filed the overdue tenth accounting and, on December 12, 2002, respondent deposited the $2,006.25 he had withdrawn from Mr. Jewell's account as payment for respondent's services on May 31, 2001. Upon the filing of the accounting, the Probate Court vacated its show-cause order but scheduled a status hearing, after which the Honorable A. Franklin Burgess, Jr. referred respondent to Bar Counsel because he had "without court approval, paid himself a fee at a rate inconsistent with the applicable rule."

## II. The Disciplinary Proceedings

The Hearing Committee was "constrained to find a misappropriation" but thought that "the stigma attached to a finding of misappropriation" was not warranted in respondent's case. Because there was no "evidence of fraud, self-dealing, misrepresentation, conflict of interest, or any pattern of inappropriate conduct," and, to the contrary, respondent's action "was, in intent and effect, in the best interest of his ward," the Committee recommended that respondent be suspended for thirty days, stayed during a one-year probationary period during which respondent would be required to complete six hours of legal education "on the subject of representing wards before the probate court." The Board issued a Report[3] recommending

---

1. The rule also permits additional fees for "extraordinary services," Super. Ct. Prob. R. 225(c), including reasonable attorney's fees for "legal services rendered to the fiduciary in the administration of the estate." *Id.* R. 225(e). The statute governing fees to conservators was modified in 1989, and currently provides for "compensation" for conservator services rather than a commission based on a percentage of disbursements from the estate. D.C.Code § 21–2060 (2001); *see* Super. Ct. Prob. R. 308 (2010) (referring to "reasonable compensation"). Respondent acknowledges that his fee petition mistakenly made reference to Probate Rule 308, which applies to conservatorships since the statute was amended, and has not challenged the trial court's denial of his petition under Probate Rule 225.

2. Although respondent had always filed the required annual accountings during his appointment as Mr. Jewell's conservator, he had often filed late, after receiving a notice from the clerk's office. The Board found that "it was not uncommon for conservators to be late" in filing their annual accounts.

3. The Board's majority report, authored by Irvin B. Nathan, was joined by five other Board members. Three members of the Board wrote separate opinions: Martin Baach (the Chair), Deborah J. Jeffrey and James P. Mercurio. All three agreed that respondent's misappropriation was intentional or reckless and not negligent. Ms. Jeffrey and Mr. Mercurio both were of the opinion that respondent's case presented "exceptional

that the court should find respondent in violation of District of Columbia Rules of Professional Conduct 1.1(a),[4] (b),[5] 1.15(a),[6] and 8.4(d).[7] The Board found that "[w]hile generally over a long period of time, respondent's representation had been competent and compassionate, his actions in dealing with the upcoming Medicaid eligibility fell short of fully competent." In particular, the Board faulted respondent for procrastinating in dealing with the need to spend down Mr. Jewell's assets and failing to inform the court and consult with other experienced practitioners. The Board found that respondent's failure to disclose in his fee petition that he had withdrawn the requested fees from the ward's account and to examine the court's files more promptly, slowed his return of the funds, and "therefore, constituted conduct seriously interfering with the administration of justice." The Board found that respondent had misappropriated client funds in violation of Rule 1.15(a), but that the misappropriation had been negligent. In the alternative, should we conclude that respondent's misappropriation was intentional or reckless, the Board expressed the view that respondent's case presents "ex-

traordinary circumstances" that overcome *Addams*'s presumptive disbarment for misappropriation that is not the result of simple negligence. In either case, the Board recommended a six-month stayed suspension. Before us, Bar Counsel argues that respondent engaged in intentional misappropriation and should be disbarred. Respondent asks that we impose the thirty-day stayed suspension recommended by the Hearing Committee.

### III. Analysis

 Upon review of a report and recommendation of the Board in an original disciplinary matter, "the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record...." D.C. Bar R. XI, § 9(g)(1). However, the court owes no deference to "ultimate facts" or questions of law determined by the Board. *See In re Micheel*, 610 A.2d 231, 235 (D.C.1992). Where, as here, the question before the court deals with misappropriation, "[w]hether [the] underlying circumstances constitute misappropriation and whether any misappropriation resulted from more than simple negligence are questions of

circumstances" that do not warrant disbarment, and would impose a stayed six-month suspension; Ms. Jeffrey felt constrained by the line of *Kersey* cases, however, to impose disbarment but suspend its execution in favor of the lesser sanction. Although he thought that disbarment is "too severe and unfortunate in this case," Mr. Baach reasoned that without guidance from this court "as to what 'the most stringent ... extenuating circumstances' might be," he could not conclude that the facts and circumstances presented warranted departure from the presumptive disbarment required by *Addams*.

4. D.C. Professional Conduct R. 1.1(a) provides, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

5. D.C. Professional Conduct R. 1.1(b) provides, "A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters."

6. D.C. Professional Conduct R. 1.15(a) provides, "A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property."

7. D.C. Professional Conduct R. 8.4(d) provides, "It is professional misconduct for a lawyer to: ... (d) Engage in conduct that seriously interferes with the administration of justice."

law concerning 'ultimate facts,' " and are reviewed by this court *de novo.* *In re Berryman,* 764 A.2d 760, 766 (D.C.2000). "[M]isappropriation is 'any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he [or she] derives any personal gain or benefit therefrom.' " *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983) (quoting *In re Wilson,* 81 N.J. 451, 409 A.2d 1153, 1155 n. 1 (1979)).

■ Respondent "concedes [the Board's] findings of facts and the violations supported by them." Because respondent withdrew funds from Mr. Jewell's account "without authorization," the Board concluded, and it is not now contested, that respondent misappropriated funds. The question for the court is whether respondent's misappropriation was intentional, reckless, or negligent. Except where the misappropriation was the result of simple negligence, we are bound by our holding in *Addams,* that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction." 579 A.2d at 191.

## A. *Intentional Misappropriation*

■ This is not a case where the misappropriation of funds resulted from "simple negligence." *Id.* Even though the Hearing Committee found that the misappropriation resulted from respondent's "failure to anticipate the May 31, 2001 [Medicaid] deadline, craft a game plan, and implement the plan with the necessary dispatch"—classic negligence language—respondent knowingly withdrew funds from his ward's account before the court had authorized his fee petition. While it is true that respondent withdrew the fee "not for [his] own use in the sense of stealing or for a temporary 'loan' but rather as a satisfac-

tion for accruing fees ... against funds which would ultimately be expected to be utilized for that purpose," *In re Fair,* 780 A.2d 1106, 1112 (D.C.2001), he nevertheless intentionally withdrew funds in order to pay what he thought was his fee without first obtaining court authorization that he knew was required.

Respondent's actions, therefore, are distinguishable from those in cases in which we concluded that the respondents' "honest, but erroneous belief" that they were entitled to withdraw the misappropriated funds constituted "simple negligence." In *Fair,* for example, the personal representative of an estate withdrew requested fees without prior court approval. 780 A.2d at 1110. We concluded that the unauthorized withdrawal constituted negligent misappropriation because the Board had found that it had become the accepted practice to withdraw fees in advance of probate court approval and, less than a year later, the legislature eliminated the need for prior approval. *Id.* at 1111–12. In *In re Travers,* withdrawal of fees prior to court approval was negligent because the lawyer " 'sincerely believed' ... his actions in obtaining the consents of the heirs and filing those consents with the court 'supported a finding that he was not reckless and that he was [in] no·way trying to mislead [the court] or conceal his conduct.' " 764 A.2d 242, 249 (D.C.2000) (second and third alteration in original). *See also Berryman,* 764 A.2d at 770–72 (summarizing cases of negligent misappropriation). The Hearing Committee found that respondent believed that the probate court would ratify his fee "because of the nature of what he was facing"—his ward's potential disqualification from Medicaid benefits—and thus "honestly" believed he was entitled to the funds. But despite finding that respondent "was not dishonest in any respect," the Hearing Committee found that respon-

dent knew withdrawal of the fees prior to court approval was improper. We agree with that assessment. The requirement of prior court approval for conservator fees was, at the time respondent withdrew the amount he had requested (but not yet obtained approval for), and continues to be, established by statute, *see* D.C.Code § 21–2060, and court rule, *see* Super. Ct. Prob. R. 308(a). Respondent's actions, albeit in good faith, were intentional, because he knew that he was required to obtain prior court approval but withdrew the funds before obtaining the court's approval. *See In re Pels*, 653 A.2d 388, 397 (D.C.1995) ("reject[ing] [the respondent's argument that] good faith—his reasonable but erroneous belief that he was entitled to the balance of the funds—reduced his culpability to simple negligence"); *In re Dulansey*, 606 A.2d 189, 190 (D.C.1992) ("A clear rational basis exists for [the] conclusion that attorneys who knowingly misappropriate funds stand in a different position than attorneys who commit other acts involving dishonesty."). That respondent's purpose in misappropriating funds was in the best interest of his ward may be relevant to what sanction should be imposed, but it is irrelevant to the determination that respondent intentionally misappropriated funds in the sense that he "handled entrusted funds in a way that reveals ... an intent to treat the funds as the attorney's own...." *Fair*, 780 A.2d at 1109–10 (quoting *In re Anderson*, 778 A.2d 330, 339 (D.C.2001)). We, therefore, disagree with the Board's conclusion that respondent's misappropriation was negligent. *See In re Bach*, 966 A.2d 350, 355 & n. 16 (D.C.2009) (Ferren, J., concurring) (quoting the Board's brief in *Addams* for proposition that "hard cases make bad law" and that automatic rule of disbarment could lead to "evasive action" in findings of "negligent" misrepresentation in order to avoid "rules that are felt to be Draconian when applied to a 'hard' case").

### B. *Exceptional Circumstances*

■ We have said that even where a lawyer has engaged in intentional misappropriation of funds, a sanction less than disbarment may be appropriate "in extraordinary circumstances," *Addams*, 579 A.2d at 191, or "[o]nly in the most stringent of extenuating circumstances," *id.* at 193 (*quoted in In re Pennington*, 921 A.2d 135, 141 (D.C.2007)). Previously we have found "extraordinary circumstances" only where the respondent's misconduct was shown to be caused by a disabling addiction, such as chronic alcoholism, *see In re Kersey*, 520 A.2d 321, 326–27 (D.C.1987), or depression, *see In re Verra*, 932 A.2d 503, 505 (D.C.2007). We have not otherwise defined what will constitute "extraordinary circumstances," but have noted that "it is appropriate for the court to consider the surrounding circumstances regarding the misconduct and to evaluate whether the mitigating factors are highly significant and [whether] they substantially outweigh any aggravating factors such that the presumption of disbarment is rebutted." *Addams*, 579 A.2d at 195. Although we disagree with the Board's characterization that respondent's misappropriation was "negligent," we agree with the Board's alternative conclusion that the circumstances of this case, where respondent engaged in intentional misappropriation for the purpose of benefitting the client, and in fact did benefit the client, warrant a departure from the presumption established by our decision in *Addams* that disbarment is the appropriate sanction for intentional misappropriation.

■ In *Addams*, we noted that mitigating factors "of the usual sort" "will suffice to overcome the presumption of disbarment only if they are especially strong

and, where there are aggravating factors, they substantially outweigh any aggravating factors as well." *Id.* at 191. Mitigating factors include "(1) an admission of wrongdoing, (2) full cooperation with the disciplinary authorities, (3) prompt return of the disputed funds, and, most importantly, (4) an unblemished record of personal conduct." *In re Pierson,* 690 A.2d 941, 950 (D.C.1997); *see also In re Reback,* 513 A.2d 226, 233 (D.C.1986) (en banc) (*cited in Addams,* 579 A.2d at 191). In *Addams,* we concluded that the presumption of disbarment was not overcome by mitigating factors where the lawyer took funds from the client's escrow account "on more than one occasion," presented a "false" accounting to the client, jeopardized his client's interest in staving off the foreclosure of the client's home by tendering a check to the noteholder that was returned for insufficient funds, and "presented conflicting explanations of his action" to Bar Counsel and the Board. 579 A.2d at 199. Respondent, on the other hand, satisfies all these mitigating factors. He has not contested the violations found by the Board and has admitted that "he should have done things differently." There is no indication that respondent has been anything but cooperative with the disciplinary authorities. Respondent returned all disputed funds prior to the initiation of the instant disciplinary action and within days of learning that the court had disapproved his petition,[8] even though, as the Board found, respondent "honestly believed he had legitimately earned the fees." Furthermore, the Board found that "[r]espondent ... has practiced in this jurisdiction for over 15 years without any prior

ethical complaint and [his] devotion over an 11–year period to his now deceased ward appears otherwise unquestioned in this record."

In addition to these "usual sort" of mitigating factors, several other factors distinguish respondent's conduct from *Addams* and other cases of intentional misappropriation we have considered. First, as the Hearing Committee concluded, "[t]here is no question that Respondent's actions were in the best interest of his ward." Second, the posture of this case is truly unique. As the Board noted, "[w]e are aware of no prior cases in which the intentional misappropriation was intended for and, in fact, benefitted the client." Thus, this case goes beyond lack of concealment and corruption. *Cf. Bach,* 966 A.2d at 352. ("[A]n attorney who knows he has done what the law forbids may not leave it to chance or the diligence of auditors to bring (or not bring) the action to light; and so the fact that respondent revealed the improper payment confirms only, we think, that he acted without the 'moral corruptness' of an intent to deceive—a factor that *Addams* makes irrelevant to deliberate misappropriation and the attendant sanction."). Here, where the Hearing Committee found that, but for the impending Medicaid review, respondent would not have filed the petition for legal fees and withdrawn the funds when he did, we are persuaded that this is the exceptional case envisioned in *Addams* where, notwithstanding intentional misappropriation, "giving effect to mitigating circumstances is consistent with protection of the public and preservation of public confidence in the legal profession." *Addams,* 579 A.2d

8. Respondent's repayment did not, as required, include any interest which had accrued while he was in possession of the misappropriated funds. *See In re Huber,* 708 A.2d 259, 260 (D.C.1998) ("The obligation to pay interest is intertwined with the obligation to make restitution. Even [where the respondent] has repaid the principal ... that would not absolve him [or her] of the duty to pay interest for the period between misappropriation and the repayment, if any.").

at 195. In this regard, respondent's actions were unlike those in *Bach*, where we disbarred the conservator who withdrew his fee before obtaining court approval because he "was afraid that if he waited for court approval of his fee petition, 'there would be no funds left to pay [his] fees,'" as the nursing home where the ward lived had made a claim against the ward's estate. 966 A.2d at 350. Respondent's case is also different from *In re Pleshaw*, where the lawyer, also a conservator, twice withdrew his fees without court approval and no reason was given as to why he did not follow the required procedure. *In re Pleshaw*, 2 A.3d 169, 171 (D.C.2010) (concluding that lawyer engaged in reckless misappropriation and should be disbarred).[9]

■ Bar Counsel argues that there are aggravating factors that preclude our finding "extraordinary circumstances" warranting a lesser sanction than disbarment: (1) that respondent ought to have withdrawn only the amount necessary ($750) to bring his ward's account below the Medicaid minimum; (2) that respondent ought to have sought the advice of more experienced attorneys or court personnel in order to determine a more appropriate way to spend down his ward's account; (3) that respondent should have disclosed the impending Medicaid review to the probate court when requesting fees and requested expedited approval by the court; and (4) that respondent's 18–month delay in checking the court docket to see if his fee request had been approved was inexplicable.[10]

We disagree with Bar Counsel that respondent's withdrawal of $2,000 rather than the $750 that was strictly necessary to bring Mr. Jewell's account below the Medicaid minimum is an aggravating factor.[11] As the Board found, the fee respondent withdrew was based upon a "reasonable" hourly rate, on time charges the Hearing Committee found to be accurate, and to which respondent believed he was entitled. *Cf. In re Cleaver–Bascombe*, 986 A.2d 1191, 1193, 1198 (D.C.2010) (imposing sanction of disbarment where lawyer "submitted a fraudulent voucher to court seeking compensation for services that she knew she had not rendered" and testified falsely before Hearing Committee). Although we agree with Bar Counsel that respondent could have better handled the need to spend down the ward's account in order to remain Medicaid-eligible by, for example, presenting the urgency of his fee petition to the probate judge and asking for expedited approval, we have not required that attorneys have "the perfection of rear-view vision." *Williams v. United*

9. *Pleshaw* was also found by the Board to have committed "many other disciplinary violations" involving three clients, but the court did not find it necessary to address them because his reckless misappropriation warranted disbarment. 2 A.3d at 175 n. 26.

10. As mentioned earlier, these are the factors that led the Board to conclude that respondent violated Rules 1.1(a) & (b) and 8.4(d). These factors also led Mr. Baach to conclude that respondent's case did not present "exceptional circumstances."

11. There has been no suggestion that respondent's efforts to "spend down" the ward's account with legitimate expenditures in order to maintain critical Medicaid eligibility constituted a fraud on the government or was otherwise improper. To the contrary, the Board found that "[t]here is no question that the[] spend-down actions were for Mr. Jewell's benefit and were proper." Bar Counsel's suggestion that respondent should have withdrawn only what was required to bring the account below the eligibility limit would suggest that the expenditure was not independently justified and that respondent was manipulating his fee request to meet the Medicaid asset eligibility requirement.

*States*, 441 A.2d 255, 260 (D.C.1982). We think that Bar Counsel's reliance on *In re Utley*, 698 A.2d 446 (D.C.1997), where we rejected imposition of a lesser sanction for non-negligent misappropriation, is misplaced. There, we found that the lawyer's "flagrant disregard of the court's inquiries for nearly two years [was] an aggravating factor of sufficient magnitude to compel [the conclusion] that she was reckless." *Id.* at 450. The lawyer in *Utley* "repeatedly [took] fees and commissions prior to receiving court approval," even after being informed that two prior withdrawals had been improper. *See id.* at 449. The lawyer in *Utley* did not show up for a court hearing or meetings with counsel to resolve the unauthorized withdrawals; nor did she appear before the Board. *See id.* at 448. Here, respondent was immediately responsive to the court's order, and returned the funds to the ward's account, once he became aware of the court's disapproval. He also has cooperated with Bar Counsel, and appeared before the Board and this court.

Bar Counsel compares this case to *Berryman*, where we said that it was not sufficient, to avoid disbarment, that the lawyer who misappropriated client funds had "rendered extraordinary service" to his client before her death. 764 A.2d at 774. What distinguishes this case from *Berryman*, however, is that the action for which respondent is being charged was *itself* motivated solely by a desire to protect his ward's interest, whereas, in *Berryman*, the lawyer withdrew client funds, using a back-dated deposit slip, in order to protect her own fee from the client's other creditors. 764 A.2d at 772–73. Similarly, in *Addams* the lawyer improperly withdrew entrusted funds for his own benefit, not the client's. 579 A.2d at 199. In sum, we conclude that though the surrounding circumstances present both mitigating and aggravating factors, the former more than

"substantially outweigh" the latter and the presumption of disbarment has been rebutted. *Id.* .Respondent's case is not only compelling but, we think, likely to be one of the rare cases that presents "the most stringent of extenuating circumstances," *id.* at 193, that overcomes the presumption that disbarment is the appropriate sanction for intentional misappropriation.

This is the first case in which the Board has asked the court to conclude that the "extraordinary circumstances" exception noted in *Addams* has been satisfied. Notwithstanding differing opinions by a minority of the Board members as to whether respondent's misappropriation should be characterized as intentional, reckless or negligent, all nine members of the Board believe that respondent should not be disbarred. See note 3, *supra*. The Board's majority report summarizes its recommendation, as follows:

> This is surely a case involving "extraordinary circumstances" analogous to those cases involving substance abuse cited in *Addams* and likewise, one in which disbarment is not the appropriate discipline. Respondent's misappropriation was carried out for the laudable purpose of benefiting his ward by insuring his ward's funds were reduced to a level below the Medicaid eligibility threshold. We are aware of no prior cases in which the intentional misappropriation was intended for and, in fact, benefited the client. Surely, a respondent, who was acting in the interests of this client, albeit in a misguided fashion, deserves the same consideration the court would give to those respondents suffering from substance abuse that contributed to their acts and who show positive signs of rehabilitation but whose clients were actually disadvantaged by the misappropriation. The situation involved in this case is unlikely to occur

again for the Respondent or for any others. This exception is unlikely to open the flood gates to more such cases.

Finally, in *Addams*, the Court stated that, "[i]n all events, it must be clear that giving effect to mitigating circumstances is consistent with protection of the public and preservation of public confidence in the legal profession." *Addams*, 579 A.2d at 195. Giving effect to the extraordinary mitigating circumstances in the present case is clearly in keeping with this precept, as Respondent's misguided actions in this one unusual situation were carried out in the interest of his client and are unlikely to recur. In our judgment, these facts make out the "extraordinary circumstances" exception permitted under *Addams* and justify a sanction other than disbarment.

 In conclusion, although we agree with Bar Counsel that Willie Hewett intentionally misappropriated funds,[12] we conclude that the facts of this case—in particular that the motivation for the misappropriation was protection of the client's interest—present the type of "extraordinary circumstances" in which disbarment is not the appropriate sanction. We adopt the Board's recommended sanction and or-

der that respondent be suspended from the practice of law in the District of Columbia for six months, the usual sanction for negligent handling of entrusted funds. *See, e.g., Fair*, 780 A.2d at 1113; *Anderson*, 778 A.2d at 332; *In re Chang*, 694 A.2d 877, 880 (D.C.1997). The six-month suspension, however, is to be stayed pending a six-month probationary period during which respondent must complete six hours of continuing legal education credits on probate procedures.[13] Finally, we order that respondent reimburse the estate of his ward for the amount of interest accrued while he was in possession of the misappropriated funds, with interest to be calculated at the legal rate of six percent per annum pursuant to D.C.Code § 28–3302(a) (2001). *See Huber*, 708 A.2d at 260–61.

*So ordered.*

12. We adopt the Board's finding that respondent's intentional misappropriation violated District of Columbia Rules of Professional Conduct 1.1(a), (b), 1.15(a), and 8.4(d). Bar Counsel urges this court to conclude that respondent also violated Rules 1.3(a) and (c). *See* D.C. Bar R. 1.3(a) ("A lawyer shall represent a client zealously and diligently within the bounds of the law."); D.C. Bar R. 1.3(c) ("A lawyer shall act with reasonable promptness in representing a client."). Bar Counsel argues that respondent violated Rules 1.3(a) and (c) by intentionally or recklessly misappropriating client funds, and that these additional rule violations warrant a suspension longer than six months. As we have concluded that respondent intentionally misappropriated funds, but that a stay of respondent's six-month suspension is appropriate, we agree

with the Board that a determination that respondent violated Rules 1.3(a) and (c) would have no bearing on the sanction and is unnecessary. *See In re Gansler*, 889 A.2d 285, 290 n. 5 (D.C.2005).

13. Respondent's only objection to the Board's recommendation is that rather than the six-month suspension recommended by the Board, he should be suspended for thirty days as recommended by the Hearing Committee. Because we conclude that respondent engaged in intentional misappropriation, we think that a six-month suspension is the appropriate sanction in light of the type of discipline we have found appropriate in cases of negligent misappropriation.