*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-BG-123

IN RE LAYN M. SAINT-LOUIS, RESPONDENT.

FILED **11/10/16**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 457001)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-217-05)

(Argued November 4, 2015                    Decided October 27, 2016)
(Amended November 10, 2016)[1]

*Melvin White*, with whom *Jeffrey W. Mikoni* was on the brief, for respondent.

*Hamilton P. Fox, III*, Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before WASHINGTON, *Chief Judge*, BECKWITH, *Associate Judge*, and REID, *Senior Judge*.

---

[1]    The amended opinion (1) corrects a typographical error on page 2, changing "Rule 1.5 (d)" to "Rule 1.15 (d)," and (2) corrects the effective date of Mr. Saint-Louis's disbarment (on the last line of the opinion) from "effective thirty days from the date of this opinion" to "effective May 15, 2015, the date on which he filed an affidavit compliant with D.C. Bar R. XI, § 14."

REID, *Senior Judge*: The Board on Professional Responsibility has recommended that Layn M. Saint-Louis,[2] Respondent, be disbarred for violations of the following Rules of Professional Conduct: (1) Rule 1.15 (a) – commingling of trust or escrow funds with the law firm's operating account; (2) Rule 1.15 (d) (now Rule 1.15 (e)) – failure to deposit unincurred (future) cost funds in an escrow account; (3) Rule 1.15 (a) – intentional misappropriation of entrusted funds; (4) Rule 1.15 (c) (now Rule 1.15 (d)) – failure to keep disputed funds separate; and (5) Rule 8.4 (c) – engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.[3] Mr. Saint-Louis challenges the Report and Recommendation of the Board on the grounds that: (1) Bar Counsel (now Disciplinary Counsel) failed to present clear and convincing evidence of ethical misconduct; (2) disbarment is inappropriate because Mr. Saint-Louis did not intentionally misappropriate client funds or engage in conduct involving dishonesty, fraud, deceit

---

[2] Mr. Saint-Louis was admitted to the Massachusetts Bar in 1996, and to the District of Columbia Bar by motion in 1998. He is a graduate of Middlebury College and Howard University School of Law. He worked at two different law firms following law school, and then founded his own two-partner law firm, known at the time of the charges against him as Saint-Louis & Johnson, P.C. ("SL&J" or "Counsel"). Prior to Disciplinary Counsel's charges against him, Mr. Saint-Louis enjoyed a fine reputation in the legal community for competence and moral integrity, and he had never been charged with any professional misconduct.

[3] The Board issued a two-page report on January 30, 2015, incorporating the Report and Recommendation of the Ad Hoc Hearing Committee.

or misrepresentation; and (3) Disciplinary Counsel's multi-year delay in prosecuting the case against him was inexcusable and prejudicial. For the reasons set forth below, we agree with the Board's recommended sanction.

## FACTUAL SUMMARY

Documentary evidence assembled by Disciplinary Counsel reveals that the events resulting in the 2012/2013 specification of disciplinary charges against Mr. Saint-Louis took place between June and November 2004.[4] On June 22, 2004, Ovlas Trading S.A. ("Ovlas"), a foreign corporation organized under the laws of Geneva, Switzerland, and SL&J, a District of Columbia professional corporation, entered into a retainer or engagement agreement. The agreement was limited to "provid[ing] legal advice and assistance to [Ovlas] with respect to all matters pertaining to the purchase and acquisition of (2) [Embraer] EMB-120 aircrafts [from DMJ Aviation International, LLC of Houston, Texas ("DMJ")], including performing due diligence, establishing escrow accounts, monitoring inspection of

---

[4] The document containing the specification of charges was signed by an assistant disciplinary counsel on March 21, 2012, and the document was stamped as "Received" by the Board on February 20, 2013, the same day on which the Board received Disciplinary Counsel's Petition Instituting Formal Disciplinary Proceedings against Mr. Saint-Louis.

aircrafts, negotiating and documenting transaction, and drafting all documents." Total compensation was set at $50,000 - $25,000 represented a "retainer deposit for the services to be rendered by Counsel pursuant to the terms [of the engagement agreement]." The remaining $25,000 "constitute[ed] final payment to Counsel for completing [the] transaction in its entirety." Ovlas agreed to pay specified costs and expenses. SL&J was required to provide monthly statements, including (1) descriptions, of all services, costs, and expenses "for any month in which services [were] rendered and/or costs incurred," and (2) "the balance of the retainer, less costs of services performed." Either party could terminate the agreement "at any time upon the delivery of written notice of termination." The agreement applied to the "present representation . . . and to any subsequent matters [SL&J] agree[d] to undertake" on Ovlas's behalf, unless the parties "agree[d] in writing to a different arrangement." The agreement also specified that it could "be modified only by subsequent written agreement signed by all parties." Patience Epelle of Ovlas sent a copy of the agreement, signed by Ms. Epelle and Mr. Saint-Louis, to SL&J via fax on June 29, 2004.

Ms. Epelle notified Mr. Saint-Louis on June 30, 2004, that $545,000 had been transferred to SL&J, $45,000 of which was earmarked for fees and expenses. After

a relatively short delay in the posting of the funds to the designated SL&J account, Mr. Saint-Louis acknowledged that the funds were received by his bank, Citibank, and should be available the morning of July 8, 2004.

In addition to his work on the aircraft purchase mentioned in his firm's engagement agreement with Ovlas, Mr. Saint-Louis began to look at alternative aircraft for purchase by Ovlas. He notified Ms. Epelle on July 8, 2004, that plans were afoot to inspect "a number of planes in Little Rock, Arkansas." He stated that he had been in touch with "Akin and Captain Mike" and was "in the process of making reservations for them to travel to Little Rock."[5] Ms. Epelle responded on the same day, indicating "good news," but she also instructed Mr. Saint-Louis to "stay action until you hear from me [because] I need to liaise with Mr. Dantata and Captain Adoga first."[6] Later on July 8, 2004, Ms. Epelle authorized the disbursement of $5,000 to Akin Sotomi, and a $50,000 deposit to DMJ, relating to the inspection of the DMJ aircraft; she cautioned that Mr. Saint-Louis "may not disburse any monies EXCEPT on my say so" (emphasis in original).

---

[5] "Akin" referred to Captain Akin Sotomi; Ms Epelle had asked Mr. Saint-Louis to "liaise with" him. "Captain Mike" referred to Captain Mike Kiker who knew about Delta aircraft available for purchase.

[6] Mr. Sayyu Dantata "controlled" Ovlas and authorized Ms. Epelle and Captain Joe Adoga to act on behalf of Ovlas.

On the following day, Ms. Epelle asked Mr. Saint-Louis to "look over" an updated purchase agreement for the aircraft from DMJ and "confirm if okay to sign." Mr. Saint-Louis responded to Ms. Epelle that the updated purchase agreement "does NOT at all [emphasis in original] protect the interest of Mr. Dantata"; he stated that he would draft a new document, and advised that he had not yet sent $50,000 to DMJ as she had instructed because the funds should go to a title company rather than DMJ. At the same time, Mr. Saint-Louis sent a more extensive email to Mr. Dantata (addressed also to Ms. Epelle although she was not listed as a recipient of the email); he asserted that the updated purchase agreement "is simply terrible – at best" because, for example, it sought "monies upfront ($500,000) without any guarantees or arrangement to finance the entire transaction."

Mr. Saint-Louis informed Mr. Dantata on July 11, 2004, that he would forward a new draft purchase agreement between Ovlas and DMJ. He indicated that he was also in communication with a source at Delta Airlines that might have the specified aircraft available at less than the $2.7 million which DMJ was seeking. A couple of hours later, he sent the new purchase agreement to Mr. Dantata. Because she had received no response to her July 9, 2004, request that Mr. Saint-Louis "look over" the updated purchase agreement for the DMJ aircraft, on

July 12 Ms. Epelle inquired about the status of Mr. Saint-Louis's review of that agreement, indicating that she was "still awaiting [his] comments or amendments." Mr. Saint-Louis replied that he had worked on the agreement and he was waiting to hear from Mr. Dantata.

Between July 15 and July 30, 2004, Mr. Saint-Louis, Ms. Epelle, and Mr. Dantata communicated mainly about the Delta aircraft, with some attention to the DMJ aircraft. Ms. Epelle (with a copy to Mr. Dantata) informed Mr. Saint-Louis on July 26, 2004, that he should deposit $50,000 with ASA/Delta "so we can move along."

The dynamic among the parties clearly began to change in August and September 2004 when (1) Captain Kiker, who had inspected the Delta Airlines aircraft, forwarded a message to Ms. Epelle on August 5, 2004, that was critical of Mr. Saint-Louis;[7] (2) Ms. Epelle requested evidence of SL&J's escrow account and the deposit of funds ($545,000) transferred by Ovlas, to SL&J; and in response to Ms. Epelle's request, Mr. Saint-Louis sent a fax transmission, dated September 1,

---

[7] Donald Stricklin, Delta Airlines's aircraft acquisitions & sales representative informed Captain M. Kiker, about his "discomfort [with] Mr. Saint-Louis's knowledge of aircraft."

2004, of purported Citibank documents pertaining to SL&J's bank accounts;[8] and (3) Mr. Saint-Louis's September 8, 2004, email proposal to Mr. Dantata and Ms. Epelle regarding his fees, and his billing statement for the period July 22, 2004, to September 7, 2004, concerning his work on the proposed acquisition of another aircraft (Premier I) and covering his trip to South Africa in connection with that proposed acquisition. Although Ms. Epelle notified Mr. Saint-Louis on July 30, 2004, that the $15,000 authorized for the South Africa trip would include his "service fee" (as well as his ticket and other expenses), the September 7, 2004, fee billing alone totaled $24,300.

---

[8] Ms. Epelle notified Mr. Saint-Louis that the "the pages from the screen print did not come through very well – too dark." The fax sent on September 1 consisted of 4 pages – a cover page (Ms. Epelle was the addressee and a typed message appeared on the cover page), a July 7, 2004, notice from Citibank to SL&J that $544,975 had been deposited to its account, earmarked as "down payment for purchase of aircraft less charges," an unreadable screen document, and a screen document reflecting a total balance of $50,000. Disciplinary Counsel obtained a copy of another September 1, 2004, fax consisting of 6 pages (the number 4 was crossed out and the number 6 inserted in handwriting). The cover page bore Ms. Epelle's name in typed letters but Captain Adoga's name appeared in handwriting as an addressee; the cover page message was identical to that on the cover page of the September 1 fax mentioned above. The documents sent with the fax cover page were: (1) a screen page of SL&J's escrow account showing a zero balance as of June 30, 2004, but a partially hidden number – $450,000 appeared as a total balance; (2) a screen page showing a deposit of $450,000 in SL&J's escrow account on July 12, 2004; (3) an undated screen page showing a total balance of $450,000; (4) another undated screen page showing a total balance of $450,000; and (5) a screen page reflecting a balance in SL&J's escrow account of $450,000 as of July 31, 2004.

By September 10, 2004, the acrimony between Mr. Saint-Louis and Ms. Epelle had become obvious. Mr. Saint-Louis complained to Mr. Dantata about a phone call from Ms. Epelle during which she allegedly said that Ovlas "is not in the drug or money laundering business and that [Mr. Saint-Louis] must take [Ovlas's representatives] as fools." Mr. Saint-Louis defended the reasonableness of his fees. The fax Mr. Saint-Louis transmitted to Ms. Epelle on September 13, 2004, set forth expenses for his South African trip in the amount of $12,011.68. In her September 14, 2004, email to Mr. Saint-Louis, Ms. Epelle referenced Mr. Saint-Louis's apparent September 11, 2004, conversation with Captain Adoga and she stated that they "are not satisfied that this account [mentioned in the Citibank documents] is actually an Escrow account." She requested "evidence of an Escrow Account." In response, Mr. Saint-Louis sent Ms. Epelle a fax on September 15, 2004, consisting of a cover page and a statement from a Citibank officer indicating that SL&J had "a non-interest bearing escrow account that was opened on September 30, 2003.

As of September 20, 2004, Ms. Epelle began dealing directly with Mr. Stricklin and Captain Kiker about the Delta aircraft purchase. However, she instructed Mr. Saint-Louis on September 24, 2004, to "liaise with [Captain] Kiker and arrange the immediate transfer of $63,000" - $60,000 deposit to Delta Airlines

for the purchase of two aircraft, and $3000 to Captain Kiker "for 10 days at $300/day." Mr. Saint-Louis confirmed the transfer of funds on September 28, 2004.

Beginning no later than October 2004, Ms. Epelle and Captain Adoga also started to handle the DMJ aircraft purchase directly, and on October 29, 2004, Ms. Epelle informed Mr. Saint-Louis that there had been "a slight change in the Embraer plans," and that he should transfer $400,000 to the escrow account of U.S. Aircraft Titles, Inc., in Oklahoma City. In addition, Ms. Epelle asked for a statement showing the balance for the escrow funds that Ovlas sent to SL&J. On November 1, 2004, Mr. Saint-Louis sent a fax to Ms. Epelle and Captain Adoga; the fax cover page stated the escrow balance as $294,975 and indicated that Ms. Epelle and Captain Adoga "needed to speak with [Mr. Dantata] immediately." Included with the cover page was a letter from Mr. Saint-Louis to Ms. Epelle and Captain Adoga vigorously opposing their decision to deal with a new agent regarding the purchase of aircraft and insisting that Ovlas move forward on the transaction with Delta Airlines, as proposed by SL&J.

In early November 2004, and apparently in response to Mr. Saint-Louis's November 1, 2004, letter, Ovlas gave a power of attorney to Ms. Epelle and Captain Adoga "[t]o undertake, continue and conclude negotiations for the purchase of Embraer Airplanes and all other matters related thereto or connected therewith." Mr. Saint-Louis criticized the power of attorney in his November 15, 2004, email and fax transmittal to Mr. Dantata. He terminated the engagement agreement between Ovlas and SL&J and included a proposed release from the agreement. He also submitted a final billing for the period September 7, 2004, through November 15, 2004, in the amount of $126,812.50; that billing showed a current balance due to SL&J of $184,554. On November 16, 2004, Mr. Saint-Louis sent Mr. Dantata (copy to Ms. Epelle) a document, entitled "Escrow Account – Final Reconciliation," showing a beginning balance of $544,975 and an ending balance of $13,587.[9] On November 17, 2004, Mr. Saint-Louis sent an email to Mr. Dantata, with a copy to Ms. Epelle, attaching a purchase agreement with Delta, and pronouncing SL&J's "retainer relationship as Counsel to Ovlas on this transaction is ended." SL&J sent Ovlas a bank check totaling $27,019.50, "the remaining escrow account balance."

---

[9] The document showed, in part, a $50,000 fee to SL&J and "Expenses-EMB" in the amount of $8,669; a "Premier One Fee (Inclusive of South Africa & Nigeria Attorney Fees)" totaling $188,544; an "ASA/Delta Transactional Cost" of $200,000 and an "ASA/Delta Transactional Fee (Reduction in Purchase Price)" of $60,000.

SL&J submitted a billing statement, dated November 18, 2004, for the period June 28, 2004, to November 18, 2004, claiming fees in the amount of $297,590.25. Ms. Epelle faxed a letter to Mr. Saint-Louis from Captain Adoga, dated November 25, 2004, accusing Mr. Saint-Louis of taking funds sent to him by Ovlas for his "own selfish purposes." Specifically, Captain Adoga (1) characterized SL&J's claim of $188,000 for the Premier 1 transaction as "fraudulent and unacceptable"; (2) described the "deduction of $200,000 . . . for the (as yet to be completed) purchase of two EMB 120 aircrafts [as] baffling"; (3) accused Mr. Saint-Louis of having failed to deposit the funds sent to him in an escrow account; (4) stated that Mr. Saint-Louis's failure to send the required monthly statements about the funds was "unacceptable"; (5) asserted that Mr. Saint-Louis "persistently failed to follow the directives" that he, Ms. Epelle, and Mr. Dantata gave him; (6) asserted that "witnesses and documents" could "prove" that Mr. Saint-Louis "made commitments both written and financial" on behalf of Ovlas that he was "not ask[ed] . . . to initiate"; and (7) indicated that SL&J's proposed release form, the escrow reconciliation document, and the "deducting [of] fictitious fees and expenses" showed that Mr. Saint-Louis "acted hastily and unprofessionally," and Ovlas "believe[d] [he] did this so as to embezzle the money." Captain Adoga demanded

that Mr. Saint-Louis "return the money . . . fraudulently taken, [and] render proper handover notes and accounts."

As further proof of Mr. Saint-Louis's alleged misconduct, Disciplinary Counsel obtained records from SL&J's bank; these records identify the activity on SL&J's escrow account from June 2004 through December 2004. The documents show: (1) a beginning balance of zero dollars as of June 30, 2004; (2) a deposit of $400,000 on July 12, 2004, and an "Average Ledger Balance" and "Average Daily Collected Balance" of $290,322.58 as of July 31, 2004; (3) an ending balance of $450,000 as of August 31, 2004; (4) a withdrawal of $49,950 on September 10, 2004, and a "wire out" of $60,000 on September 24, 2004, leaving an ending balance of $339,975 as of September 30, 2004; (5) withdrawals of $10,000 on October 8, 2004, $15,000 on October 15, 2004, and $20,000 on October 25, 2004, leaving an ending balance of $294,975 as of October 31, 2004; (6) withdrawals of $32,557.75 (twice), $27,019.50, international wire outs of $2,000 and $750 on November 17, 2004, a wire out of $50,000 on November 18, 2004, withdrawals of $50,000 and $49,985 on November 22, 2004, and a withdrawal of $25,000 on November 29,

2004, leaving an ending balance of $25,000 as of November 30, 2004; and (7) an ending balance of $24,990 as of December 31, 2004.[10]

Bank records reflecting SL&J's operating account show a deposit of $49,950 on September 10, 2004, and a debit of $45,630, in the form of check number 1500, on September 15, 2004. Records subpoenaed by Disciplinary Counsel from Jim Coleman Toyota reveal that check no. 1500 was made payable to Jim Coleman Toyota on September 10, 2004, in the amount of $45,630, for the purchase of a Sequoia Toyota by SL&J. The transaction was executed by Renette Belizaire, and a picture of Mr. Saint-Louis's driver's license was part of the subpoenaed documents. SL&J's operating account records reflect deposits on October 8, 15, and 25, respectively, of $10,000, $15,000, and $20,000, the same amounts withdrawn from SL&J's escrow account on the same days. On November 17, 2004, the same day on which SL&J's escrow account records showed the withdrawal of two identical sums of $32,557.75, SL&J's operating account showed a deposit of $32,557.75.

---

[10] For some of the transactions, including the international and domestic transfer of funds, the bank imposed a service charge, taken from escrow funds.

In addition to its documentary evidence, Disciplinary Counsel presented Barbara Karuri as a witness. Ms. Karuri testified that she began working at SL&J as a law clerk on a part-time basis in November 2003 and remained employed by the firm until around August or September 2004. She was not a member of any Bar during her time at SL&J and was not admitted to the Bar (New Jersey) until January 2006. According to her SL&J contract, her billing rate was $75 to $125 an hour. During her time at SL&J, Ms. Karuri worked on the Ovlas matter. She researched airplane and airplane vendors, and she assisted in drafting preliminary contracts as requested by Mr. Saint-Louis. She retained a copy of her time sheets and other records (which she downloaded on a CD) when she left SL&J, and she turned over a copy to Disciplinary Counsel.

Among the records Ms. Karuri retained was a copy of conference call notes, dated August 11, 12, and 18, 2004. These notes were identical to a document Disciplinary Counsel obtained from Mr. Saint-Louis, except for an entry on August 11, 2004, relating to notes on a conference call with Captain Adoga. The copy obtained from Mr. Saint-Louis contained the following entry: "Discussed hourly billing rates of $300/350 for firm and sending all bills at end. Okay." The copy of the conference call notes with Captain Adoga that came from Ms. Karuri's CD did

not contain that entry, and Ms. Karuri asserted that she did not input the entry. Furthermore, after examining her time sheets for work performed at SL&J and billing statements submitted to Ovlas by Mr. Saint-Louis, Ms. Karuri stated that the billing statement reflected work done by her on days she did not work, particularly in the month of July 2004 when she did not work at all because she was preparing for or taking the Bar exam. There were other dates in June, August, September, and October on which Ms. Karuri stated that she did not work, but billing statements reflected entries for her on those same dates. In addition, the November 18, 2004, SL&J billing statement that claimed $297,590.25 in fees listed Ms. Karuri as an attorney for billing purposes – before her admission to the Bar in 2006. The Ad Hoc Hearing Committee credited Ms. Karuri's testimony about the conference call notes and about the days on which she did not work.

In April 2005, an attorney for Ovlas lodged a complaint against Mr. Saint-Louis, with Disciplinary Counsel, together with an affidavit from Ms. Epelle. Mr. Saint-Louis responded promptly to communications from Disciplinary Counsel, produced thousands of documents, and met with Disciplinary Counsel several times, through counsel.

Years later, on August 6, 2013, and September 4, 2013, Mr. Saint-Louis testified before the Ad Hoc Hearing Committee. His testimony and the documentary evidence submitted by him (much of which mirrored Disciplinary Counsel's evidence) formed the basis of his defense.

During his testimony, Mr. Saint-Louis maintained that based upon his conversation with Mr. Dantata, SL&J "immediately earned" $25,000 in fees, and the requirement for a written agreement for subsequent matters "did not apply to the other two matters [SL&J] ended up doing for Ovlas . . . because they were not contemplated at the time of [the Ovlas engagement agreement] for this transaction," that is, the DMJ aircraft purchase. Mr. Saint-Louis acknowledged that "as opposed to a flat fee, a retainer that has not been earned, has to be deposited in an escrow account," and that he "never sent a single monthly statement to the client." However, he declared that he did not send any monthly statements "because before the month was even done, . . . the client had decided to go to two new transactions and buy aircraft from sellers and not brokers." He asserted that even though he informed Ms. Epelle that he would bill at the rate of $300.00 per hour, Mr. Dantata had approved his billing at the rate of $350.00 per hour, the same rate paid to Nigerian attorneys. Yet, when an assistant disciplinary counsel asked whether Mr.

Saint-Louis could "show us something that authorize[d] [him] to bill [his] time at $350 an hour," he replied, "I can't."

Mr. Saint-Louis agreed that SL&J's escrow fund did not reflect the funds sent to him in early July 2004 by Ovlas, but he insisted that "Mr. Dantana authorized [him] to move [$450,000] to [SL&J's] escrow account because the initial transaction was not going as [Ovlas] had initially planned," and that the original "understanding" was that the funds in SL&J's operating account would "transition out to a third-party transactional account, which at the time it was believed to be DMJ." Moreover, Mr. Saint-Louis claimed that there were emails and "a verbal discussion" with Mr. Danata indicating Ovlas's agreement to pay SL&J fees for the Premier 1 transaction. Yet, he admitted that Ms. Epelle's communications to him specified that the $15,000 authorized for the South Africa trip (relating to Premier 1) "include[d] not only [his] expenses but [also his] fees." With respect to the Delta aircraft transaction, Mr. Saint-Louis stated that Mike Kiker is "an American [who] ferries aircraft to different places," and Mr. Saint-Louis admitted that Ms. Epelle approved the $5,000 payment to Akin Sotomi, but she did not approve any payment for Captain Kiker. Later, Mr. Saint-Louis said he believed that his July 15, 2004,

payment of $1,022 to Mr. Kiker was "verbally" authorized "primarily by Ms. Epelle."

With regard to withdrawals from the escrow account in November 2004, Mr. Saint-Louis stated that the two withdrawals of $32,557.75 on November 17, "probably" went into SL&J's "operating account and . . . a money market account," the $2,000 and $750 withdrawals of the same date to South African lawyers, $50,000 on November 18 went to his wife, the $50,000 and $49,985 withdrawals on November 22 were placed in the money market account, and $25,000 in funds withdrawn on November 29 "belonged to [SL&J]."[11]   When asked by the assistant disciplinary counsel whether his firm was paid "in the neighborhood of $425,000.00," Mr. Saint-Louis answered, "Possibly.  Whatever the numbers are." He agreed that "[w]hen the transaction [with Ovlas] changed, [Ovlas and SL&J] "didn't do a new retainer agreement."

---

[11]   In its report and recommendation, the Ad Hoc Hearing Committee references pages 234 to 36 of the hearing transcript as containing the discussion of the September 10, 2004, withdrawal relating to the purchase of the of the SUV, but those pages are missing from the August 6, 2013, transcript.

The comprehensive Report and Recommendation of the Ad Hoc Hearing Committee contained substantial factual findings regarding the events set forth above in the Factual Summary. These findings included the engagement agreement between Ovlas and SL&J, the funds Ovlas wired to SL&J, the handling of those funds by Mr. Saint-Louis and SL&J, the documents pertaining to those funds sent by Mr. Saint-Louis to Ovlas, SL&J bills that Mr. Saint-Louis sent to Ovlas, Mr. Saint-Louis's escrow account reconciliation and the November withdrawal of Ovlas's funds from SL&J's escrow account.

With regard to Disciplinary Counsel's multi-year delay in proceeding with the charges against Mr. Saint-Louis, the Ad Hoc Hearing Committee declared, "It is unclear why [Disciplinary] Counsel waited so very long to determine its position with respect to this case." The Committee also characterized the delay as "massive and inexcusable." Nevertheless, the Committee determined that Mr. Saint-Louis was not prejudiced by the delay because (1) it found "no witness who would have testified but did not"; (2) "[t]here were no credibility determinations that the Committee has made that turn on a poor memory due to the passage of time"; and (3) Mr. Saint-Louis "was able to continue the practice of law while Bar Counsel's investigation remained pending." Based on its factual findings and its review of

our case law, the Committee concluded that Mr. Saint-Louis violated all of the rules set forth in the specification of charges and that dismissal of the charges due to delay alone was unwarranted.

As for the sanction, the Committee asserted that (1) Mr. Saint-Louis's "misappropriation in this case was significant and troubling" and amounted to intentional misappropriation; (2) Mr. Saint-Louis "compounded his misconduct by his dishonesty"; (3) although Mr. Saint-Louis had a "clean disciplinary record," it is not a mitigating factor in cases of intentional misappropriation; and (3) excessive delay is not a mitigating factor if there is no showing of prejudice.

In its short Report and Recommendation, which adopted the Committee's Report and Recommendation, the Board agreed that "[Disciplinary] Counsel's delay in bringing charges was unacceptable but Mr. Saint-Louis failed to "establish that he suffered prejudice as a result of the delay, or that the delay was a mitigating factor. The Board also determined that the Committee's factual findings are "supported by substantial evidence in the record," and that the Committee's "conclusions of law [are] supported by clear and convincing evidence." Consequently, the Board recommended disbarment as the appropriate sanction.

## ARGUMENTS OF THE PARTIES

Mr. Saint-Louis essentially criticizes the Committee for allegedly relying on the hearsay letter of Captain Adoga and for its discrediting of the testimony and account of events by Mr. Saint-Louis.[12] He contends that "the Committee's Findings and Conclusions must be overturned because the Committee placed undue confidence in the hearsay Adoga letter, evidence that is too unreliable to justify the weight given to it." He also argues that Captain Adoga was biased against Mr. Saint-Louis and that "[h]earsay statements made by an adverse witness, who Mr. Saint-Louis was never given an opportunity to cross-examine and whose demeanor and credibility the Hearing Committee could not assess, cannot satisfy [Disciplinary] Counsel's burden of proving Rules violations by clear and convincing evidence." He insists that (1) his firm's representation of Ovlas "expanded greatly in the months following the adoption of the Engagement Agreement"; (2) he "would not have agreed to perform all this additional work without receiving additional

---

[12] During oral argument, counsel for Mr. Saint-Louis emphasized that due process violations in this case warranted dismissal of the charges against Mr. Saint-Louis, presumably in part because he was unable to locate and examine certain individuals or present them as witnesses. In his brief, Mr. Saint-Louis specifically identifies Mr. Dantata, whose testimony, he believed, "would have substantiated his explanation of the fee arrangements, authorizations, and [SL&J's] general course of conduct with regard to Ovlas."

compensation," and (3) his billing statement dated September 7, 2004, as well as his September 8, 2004, privileged and confidential email to Ms. Epelle (copy to Mr. Dantata) proposing a fixed fee rather than an hourly rate, established that his hourly billing practice "would continue unless a differing arrangement was reached."[13]   He maintains that the withdrawals from the escrow account were authorized because "Ovlas was repeatedly informed that the escrow account balance reflected Mr. Saint-Louis's withdrawals, and [Ovlas] made no contemporaneous objections to these balance statements.   He also claims that because Disciplinary Counsel did not present clear and convincing evidence to prove his violation of the charged Rules, disbarment was inappropriate.

In response, Disciplinary Counsel claims that Mr. Saint-Louis is "re-litigating the facts."   Disciplinary Counsel argues that (1) the Ad Hoc Hearing Committee discredited the testimony of Mr. Saint-Louis; (2) Captain Adoga's letter "was

---

[13]   The September 7, 2004, statement covering the period July 22 to September 7, 2004, showed a balance due of $24,300.   In his September 8, 2004, email Mr. Saint-Louis "propose[d] a fixed fee arrangement for the entire [Premier 1] transaction calculated on the nature of the transaction as opposed to billing based upon our hourly rate of $300 per hour (and not our standard $350 rate)."   He estimated that fees at the hourly rate would "range at the least between $68,000 and $90,000."   He "therefore suggeste[d] payment of the currently due amount and a middle ground fixed fee for the remainder of the transaction."

credible," but it was not "the sole basis for the Hearing Committee's findings of fact"; (3) "Many contemporaneously-written documents, woven throughout the Hearing Committee's recitation of facts, told the true story of the Ovlas representation"; (4) the record does not substantiate Mr. Saint-Louis's version of events; (5) the inexcusable delay in the proceedings did not prejudice Mr. Saint-Louis, and (6) "the case for disbarment is overwhelming."

In his Reply Brief, Mr. Saint-Louis presses his argument about the unreliability and central role of Captain Adoga's hearsay letter in discrediting his testimony concerning the events that led to the charges against him. He contends that, "Because the [Ad Hoc Hearing] Committee used the hearsay Adoga Letter to impeach Mr. Saint-Louis and then turned around and used the impeachment of Mr. Saint-Louis to credit the hearsay Adoga Letter, the Committee's findings and conclusions that flow from the Adoga Letter are based exclusively on hearsay," and hence it is subject to "exacting scrutiny." He claims that Captain Adoga's letter "cannot withstand exacting scrutiny within the context of the rest of the documentary evidence," evidence that he asserts is entitled to little or no weight.

Furthermore, Mr. Saint-Louis continues to highlight his version of the events and to argue that Disciplinary Counsel did not present clear and convincing evidence that he violated the specified Rules of Professional Conduct. Finally, he contends that the disbarment recommendation is "improper and should be set aside," because Disciplinary Counsel's delay "rendered every Ovlas witness unavailable" and deprived him "of any opportunity to examine them . . . or otherwise address the question of their own credibility," and because the absence of Ms. Epelle, Captain Adoga, and Mr. Dantata "allowed [Disciplinary] Counsel to characterize the documentary record however it saw fit, without concern that such characterizations could not be corroborated by credible testimony."

**STANDARD OF REVIEW AND APPLICABLE LEGAL PRINCIPLES**

This court conducts a *de novo* review of the Board's legal conclusions. *In re Howes*, 52 A.3d 1, 12 (D.C. 2012) (citing *In re Cleaver-Bascombe*, 986 A.2d 1191, 1195 (D.C. 2010) (per curiam)). However, the Board (and this court) must accept the factual findings of the Hearing Committee if they are based upon substantial evidence in the record. *Id*.; *see also* D.C. Bar R. XI, § 9 (h)(1). We must "adopt the recommended disposition of the Board unless to do so would foster a tendency

toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Rodriguez-Quesada*, 122 A.3d 913, 921 (D.C. 2015) (internal quotation marks and citation omitted).

"In determining what sanction to impose upon an attorney for violations of the Rules of Professional Conduct, we consider a number of factors, including (1) the nature and seriousness of the misconduct; (2) prior discipline; (3) prejudice to the client; (4) the [attorney's] attitude; (5) circumstances in mitigation and aggravation; and (6) the mandate to achieve consistency." *Id.* (internal quotation marks and citation omitted). "We also consider the moral fitness of the attorney and the need to protect the public, the courts, and the legal profession." *Id.* (internal quotation marks and citation omitted). We do not seek to punish the attorney; rather we endeavor to "deter future and similar conduct" and to protect the public. *Id.* (citation omitted).

Misappropriation by an attorney means "any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001)

(internal quotation marks and citation omitted). Misappropriation may be negligent, intentional, or reckless. Moreover, "misappropriation resulting from more than simple negligence need not be intentional or purposeful to warrant disbarment." *Id*. (internal quotation marks and citation omitted). It may be reckless, that is, it may "demonstrate[] an unacceptable level of disregard for the safety and welfare of entrusted funds." *Id*. at 336 (citation omitted). Both intentional and reckless misappropriation generally will result in disbarment because "the attorney handled entrusted funds in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds." *In re Fair*, 780 A.2d 1106, 1109-1110 (D.C. 2001) (citation omitted).

"[A]n undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct." *In re Williams*, 513 A2d 793, 796 (D.C. 1986) (per curiam). However, if a respondent demonstrates that an undue delay in prosecution "impaired his defense," "delay coupled with actual prejudice could result in a due process violation, in which case [this court] would be unable to agree with a finding that misconduct had actually been shown." *Id*. at 797 (citation omitted). Furthermore, extended delay in prosecuting a case may be a mitigating

factor with respect to the discipline imposed; it may result in a shorter period of discipline, but not in the elimination of the proposed sanction. *In re Scheider*, 553 A.2d 206, 212 (D.C. 1989); *In re Ponds*, 888 A.2d 234, 244 (D.C. 2005).

## ANALYSIS

### *The Excessive Delay*

Here, Disciplinary Counsel readily admits that the multi-year delay in prosecuting this case is inexcusable. Indeed the delay is quite troubling because Disciplinary Counsel, the Committee, and the Board have not, and apparently cannot, explain the reason for the protracted delay in this case. Nevertheless, our case law explicitly states that delay alone does not lead to the dismissal of misconduct charges. *In re Williams*, *supra*, 513 A.2d at 796. What is required for dismissal of the misconduct charges is delay plus actual prejudice that results in a due process violation. *Id*. at 797. We discern no due process violation on this record. Mr. Saint-Louis received proper notice of the charges against him, and had an opportunity to respond to those charges throughout the disciplinary proceeding, including his evidentiary hearing. His assertion that the "delay rendered every Ovlas witness unavailable" and deprived him "of any opportunity to examine them .

. . or otherwise address the question of their own credibility," is not supported by the record. We see no evidence of concrete efforts on Mr. Saint-Louis's part to contact Ms. Epelle, Mr. Dantata, or Captain Adoga in 2005, after Ovlas filed its complaint with Disciplinary Counsel, together with an affidavit from Ms. Epelle. Nor do we see evidence of efforts on Mr. Saint-Louis's part to locate and subpoena Ms. Epelle, Captain Adoga, and Mr. Dantata to appear at the August/September 2013 evidentiary hearing. Moreover, there is no documentary evidence showing a refusal by Mr. Dantata, in response to a written communication from Mr. Saint-Louis, to provide testimony at the hearing.

Significantly, the record is devoid of (1) contemporaneous notes (not subject to question) made by Mr. Saint-Louis, or emails, fax transmittals, or other written documents showing that Ovlas agreed to alter its fee agreement with SL&J; (2) an amended engagement agreement, in writing, covering SL&J's work on the Premier 1 transaction, even though the June 22, 2004, engagement agreement between Ovlas and SL&J explicitly provided that the agreement applied not only to the "present representation," but also to "any subsequent matters [SL&L] agree[d] to undertake" on Ovlas's behalf, "unless the parties agree[d] in writing to a different arrangement"; and (3) authorization for the substantial withdrawals that Mr. Saint-Louis made in

September, October and November 2004 from SL&J's escrow account. Mr. Saint-Louis appears to claim that because he proposed a fixed fee agreement in his September 8, 2004, e-mail and Ovlas expressed no contemporaneous disagreement, his proposed arrangement was in effect. However, nothing in the record suggests that Ovlas accepted a fixed fee arrangement, or that the terms of such an arrangement were ever agreed to by both parties. Indeed, Mr. Saint-Louis admitted during his hearing testimony that he had no document that authorized him to bill his fee at the rate of $350 per hour. He also admitted that no new retainer agreement between Ovlas and SL&J had been executed.

The circumstances of the disciplinary proceeding against Mr. Saint-Louis show that a shorter period of discipline because of excessive delay is not appropriate. In short, even though the multi-year delay in this case is troubling and inexcusable, we are unable to conclude that that delay rises to a due process violation that warrants dismissal of the misconduct charges against Mr. Saint-Louis.

Nor can we agree on this record that the protracted delay warrants mitigation of the sanction in this case. We made clear in our decision in *In re Fowler*, 642 A.2d 1327, 1331 (D.C. 1994), that "the circumstances of the individual case must be

sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." We did not detect unique and compelling circumstances in *In re Howes*, *supra*, where the respondent's misconduct took place between 1993 and 1995, and his disciplinary hearing was not held until 2007. 52 A.3d at 5, 19 n.22. There, respondent continued to practice law from 1995 until his suspension on September 30, 2010. *Id*. at 19 n.22. The Committee here specifically found that: (1) "there was no witness who would have testified but did not," (2) "[t]here were no credibility determinations that the Committee has made that turn on a poor memory due to the passage of time," and (3) Mr. Saint-Louis "was able to continue the practice of law while [Disciplinary] Counsel's investigation remained pending." Given these findings, we see no "unique and compelling" justification for lessening the sanction in this case due to excessive delay.

### *Misappropriation*

The Committee and Board found that one of the most serious rule violations attributed to Mr. Saint-Louis was misappropriation. There is no "scienter" requirement in this court's approach to misappropriation; misappropriation "is

essentially a per se offense." *In re Berryman*, 764 A.2d 760, 768 (D.C. 2000) (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983)). Under our case law it is clear that Mr. Saint-Louis's act of taking funds Ovlas entrusted to his care (under the guise of entitlement to attorney's fees), without written authorization, constituted misappropriation; and his unauthorized transfer or disbursement of entrusted funds to SL&J's operating account, money market fund, or to his wife, for his own purposes, also constituted misappropriation. *In re Anderson*, *supra*.

The transfers or disbursements did not result from simple negligence on Mr. Saint-Louis's part, and the record reveals no "honest, but erroneous belief" on Mr. Saint-Louis's part that he was entitled to withdraw Ovlas's funds from the escrow account. On July 8, 2004, Ms. Epelle informed Mr. Saint-Louis that he "may not disburse any monies EXCEPT on my say so," and on July 30, 2004, she notified Mr. Saint-Louis that the $15,000 authorized for expenditures relating to the Premier 1 transaction and his trip to South Africa included his "service fee." Yet, he billed $24,300 in fees on September 7, 2004. Furthermore, Mr. Saint-Louis's insistence that $25,000 of the $50,000 fee stated in the engagement agreement was immediately payable to his firm is unconvincing. The engagement agreement specifically refers to "a retainer deposit for the services to be rendered" by SL&J,

and the engagement agreement also required monthly statements showing "the balance of the retainer, less costs of services performed."  SL&J never submitted any monthly statements, as required.  Therefore, Ovlas could not determine, on a monthly basis, the amount of fees that SL&J was billing against the retainer deposit.

Despite Mr. Saint-Louis's repeated insistence that Mr. Dantata authorized him to bill $300 or $350 per hour, there is no written documentation in the record showing such authorization by Mr. Dantata, Ms. Epelle, or Captain Adoga.  Nor is there any written support for Mr. Saint-Louis's insistence that his withdrawals of substantial sums of money from the entrusted funds in September, October, and November (to the extent of almost depleting Ovlas's funds) were authorized as fees to which he and SL&J were entitled.

Given Mr. Saint-Louis's admission, during his testimony at the hearing on the charges against him, that there was no new written retainer agreement executed for the work on the Premier 1 and Delta aircraft transactions, the conclusion is inescapable that Mr. Saint-Louis intentionally or recklessly misappropriated Ovlas's escrow funds as his own.  That is, his behavior in withdrawing the funds from the escrow account and transferring or distributing them to other accounts (operating

and money market) and to his wife, at the least evidenced his reckless misappropriation – his "conscious indifference to the consequences of his behavior for the security of the funds." *In re Fair*, *supra*, 780 A.2d at 1109-10 (quoting *In re Anderson*, *supra*, 778 A.2d at 339); *In re Hewett*, 11 A.3d 279, 285-86 (D.C. 2011); *see also In re Bach*, 966 A.2d 350, 351-52 (D.C. 2009).

### *Dishonesty*

The second serious rule violation which supports both the misappropriation finding and the sanction of disbarment in this case is the finding that Mr. Saint-Louis was dishonest. Mr. Saint-Louis centers his argument that he did not engage in dishonesty on what he perceives as an invalid discrediting of his hearing testimony by the Committee, based on Captain Adoga's hearsay letter. However, in light of substantial record evidence, Mr. Saint-Louis's dishonesty can be established through his own files submitted to Disciplinary Counsel, including his billing statements, notes relating to one of his telephone calls with Captain Adoga, and a fax transmittal to Ms. Epelle. His billing statements reveal that he used an attorney's billing rate for Ms. Karuri even though she had not been admitted to any Bar during her work at SL&J. The billing statements, coupled with Ms. Karuri's testimony

(which the Committee credited), establish that he included billing hours for Ms. Karuri on days on which she performed no work. Mr. Saint-Louis submitted telephone conferences notes containing an entry for an August 11, 2004, call with Captain Adoga – "Discussed hourly billing rates of $300/350 for firm and sending all bills at end." However, this entry was not present in the copy of the telephone call notes that Ms. Karuri retained when she left SL&J. Moreover, in response to Ms. Epelle's request for proof that the Ovlas funds sent to Mr. Saint-Louis were in an escrow account, Mr. Saint-Louis sent her unreadable bank copies from the escrow account with the message, "we are holding $500,000," even though he submitted readable bank copies of the same transmittal to Ms. Epelle to Disciplinary Counsel showing that Mr. Saint-Louis transferred only $450,000 of the $545,000 sent to him by Ovlas from SL&J's operating account to its escrow account. In short, Captain Adoga's letter is not the only evidence of Mr. Saint-Louis's dishonesty. Other record documents provided clear and convincing evidence of Mr. Saint-Louis's dishonesty.

*The Sanction*

"[I]n virtually all cases of misappropriation, disbarment will be the only appropriate sanction, unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). Here, as we indicate above, Mr. Saint-Louis's misappropriation is properly characterized as intentional or reckless. *See In re Fair*, *supra*, 780 A.2d at 1109-10; *In re Anderson*, 778 A.2d at 336. The usual mitigating factors, such as a lack of prior discipline, do not lead to a lesser sanction in cases of intentional or reckless misappropriation. *In re Addams*, *supra*, 579 A.2d at 191, 192 n.4. Furthermore, excessive delay in the disciplinary process does not warrant a lesser sanction, without a showing of actual prejudice. *See In re Howes*, *supra*, 52 A.3d at 19 n.22; *In re Fowler*, *supra*, 642 A.2d at 1331; *In re Williams*, *supra*, 513 A.2d at 797. We conclude that there is substantial record evidence supporting the sanction of disbarment for intentional or reckless misappropriation.

Accordingly, for the foregoing reasons, we accept the recommendation of the Board, and it is therefore ORDERED that respondent, Layn M. Saint-Louis, is

disbarred from the practice of law in the District of Columbia, effective May 15, 2015, the date on which he filed an affidavit compliant with D.C. Bar R. XI, § 14.


*So ordered.*